UNITED STATES of America, Plaintiff,

v.

ONE 1988 PREVOST LIBERTY MOTOR HOME, Measuring 40 Feet in Length, also known by Vehicle Identification Number 2P9M33403J1001532, and Bearing Oregon License Plate H998173, Defendant.

Civil Action No. H–93–0980.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 3, 1996.

Michael B. Schwartz and William Emerson Yahner, Office of U.S. Attorney, Houston, TX, for the U.S.

Arch M. Skelton, Dallas, TX, for LMC Investments Inc.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

### INTRODUCTION

This Memorandum and Order supersedes the Court's Findings of Fact and Conclusions of Law entered on October 21, 1996 [Doc. # 167] in this case.[1]

The United States of America (the "United States" or "Government") brought this civil forfeiture action against One 1988 Prevost Liberty Motor Home ("Defendant Property" or the "Motor Coach") pursuant to 18 U.S.C. § 981(a)(1)(A). The Government contends that the Defendant Property is proceeds traceable to a money laundering violation under 18 U.S.C. § 1956(a)(1)(A). The money laundering violation is premised on bankruptcy fraud by Lawrence or Larry Sheehan ("Sheehan") in violation of 18 U.S.C. § 152.

LMC Investments Inc. ("LMC" or "Claimant") is a Missouri corporation that has filed a claim in this action contesting the forfeiture and contending that it is the owner of the Motor Coach. Sheehan does not personally make a claim to the Defendant Property. The Government contends that LMC lacks standing to contest this forfeiture since it lacks a genuine interest in the Defendant Property.

Claimant LMC asserts eleven defenses in its Third Amended Answer and Claim for Damages and Attorney's Fees [Doc. # 79] ("Answer"), which can be summarized into four categories. First, LMC claims that

---

1. The Court's prior findings and conclusions are modified in response to the United States' Motion to Amend and Correct Findings of Fact and Conclusions of Law [Doc. # 172]. Claimant LMC Investments, Inc. did not oppose the Motion. Accordingly, the Motion is GRANTED.

there was no bankruptcy fraud or money laundering violation by Sheehan and therefore forfeiture is unlawful since the Defendant Property is not involved in and is not proceeds of any illegal activity. Second, it contends that there is no substantial connection between the fraud allegedly committed in Sheehan's bankruptcy and the Defendant Property or the farm and lake house, the proceeds of which were used to purchase the Defendant Property. Third, Claimant contends that it is an "innocent owner," and is entitled to avoid the forfeiture since the predicate offenses have been shown to have been committed without knowledge of the owner. Fourth and finally, Claimant challenges the procedures used in connection with and the timeliness of this action. *See* Answer, at 12–16.

A five day bench trial was held in this case. The Court holds that LMC has failed to establish that it has standing to contest this forfeiture. Nevertheless, since a substantial trial was held, the Court addresses the merits, in the event of a challenge to its initial ruling. On the merits, the Court holds that many of the LMC defenses are not legally viable, and that Claimant has failed to prove any of the other defenses by a preponderance of the evidence. The Defendant Property therefore is forfeited to the United States for disposition as appropriate under law.

### FINDINGS OF FACT

1. ***Procedural Posture of This Forfeiture Action***

The Defendant Property is a 1988 Prevost Liberty Motor Home, measuring 40 feet in length, also known by vehicle identification number 2P9M33403J1001532, and bearing Oregon license plate H998173.

Upon application of Plaintiff United States, on April 2, 1993, Magistrate Judge Mary Milloy issued a Warrant for Arrest in Rem directing the United States Marshal for the Middle District of Florida to seize and maintain the Defendant Property. On that day, the Defendant Property was in the possession of Larry Sheehan and his wife, Loretta Jean Adkinson Sheehan, at Richardson's Fish Camp, 1550 Scotty's Road, Kissimmee, Florida. Testimony of Larry Sheehan ("Sheehan Testimony"). On April 9, 1993, the property not having yet been seized, the United States moved for issuance of an Amended Warrant for Arrest in Rem, alleging as grounds that the Defendant Property had been removed from the Middle District of Florida. On April 9, 1993, Magistrate Judge Marcia Crone issued an Amended Warrant for Arrest in Rem directing the United States Marshal's Service to seize and maintain the Defendant Property.

The Defendant Property was seized near Covington, Kentucky by the United States Marshal's Service for the Western District of Kentucky on or about April 14, 1993, after being abandoned by Larry Sheehan and Loretta Jean Adkinson Sheehan. Since its seizure, the Defendant Property has remained in the care and custody of the United States Marshal's Service for the Western District of Kentucky in Louisville, Kentucky.

Pursuant to a Stipulation entered into by the United States and LMC, *see* Doc. # 21, probable cause existed for the seizure of the Defendant Property. Because LMC sought repeatedly to withdraw its agreement to the Stipulation, the Court at trial also made a finding that probable cause existed based on the evidence adduced during the first several days of trial.

The only claimant with respect to the Defendant Property is LMC. Sheehan has expressly disclaimed any ownership, lessee or possessory interest in the Defendant Property.

2. ***Background of LMC and its Shareholders, Officers and Directors***

LMC has two 50% shareholders, William A. Ross ("Ross") and Michelle T. Sheehan. Ross is president and Michelle Sheehan is secretary of LMC. Ross and Michelle Sheehan also constitute LMC's board of directors. William A. Ross was a fellow pilot of Sheehan's at Continental Airlines (and a farm owner); they met at Continental Airlines in the mid–1980's. Michelle Sheehan, who was born on August 27, 1970, is the daughter of Sheehan.

There is no evidence that Michelle Sheehan's involvement in LMC extended beyond signing documents prepared by others. *See* Memorandum and Order, dated March 7, 1995 [Doc. # 55], at 2. Michelle Sheehan has never refused to sign any documents prepared and sent to her by others relating to LMC. Ross' involvement was only slightly more substantive on isolated occasions in 1989, and ceased completely after he learned he had cancer. Cully and Ross Testimony; *see* LMC Ex. 30.

LMC apparently was formed in or about April 1986, according to unsigned Minutes of First Meeting of Shareholders and Minutes of First Meeting of Board of Directors and an unsigned stock certificate, each dated April 2, 1986. USA Ex. 6, 7, 8. The evidence of the identity of the initial shareholder(s) is the unexecuted stock certificate and a reference in the Minutes of First Meeting of Shareholders indicating Sheehan was the sole shareholder. USA Ex. 6, 7. The certificate was in the files of LMC's and Sheehan's attorney, Michael Cully ("Cully"). Cully Testimony. Sheehan claims he was never a shareholder of LMC.[2] There is no dispute, however, that he was President of LMC from the time of its formation until sometime in May 1989, when he purportedly resigned. LMC Ex. 9A, 9B. The share certificates evidencing Michelle Sheehan's and Ross' ownership interests in LMC were prepared in 1994, after this litigation was commenced. USA Ex. 9–12. Neither Ross nor Michelle Sheehan could recall when they first received their certificates. Only after this action was filed by the United States did Ross and Michelle Sheehan prepare lost stock certificates. *Id.*

**2.** Sheehan claims he created and named LMC for his three daughters, including Michelle, but that ultimately he eliminated all but Michelle as owners. It is interesting to note, however, that the letters "L," "M," and "C" match the first initials of the first names of the three initial shareholders identified in the First Meeting of Shareholders, Larry Sheehan, Michael Cully and Chris Noble (a pilot and accountant friend of Sheehan's).

**3.** Union National Bank obtained a stipulated judgment against Sheehan in the amount of

### 3. *Sheehan's Rationale For Use of Corporate Ownership*

On March 10, 1986, Sheehan informed United Savings & Loan Association of Lebanon, Missouri ("United Savings") by letter that he had instructed his attorneys to transfer his personal assets to "corporate umbrellas" in order to shield them from potential creditors. USA Ex. 1. He stated that he was in the process of transferring legal title to personal assets into corporate nominees. USA Ex. 1; Sheehan Testimony. Sheehan was in default of a May 1985 personal loan, that already had been extended twice but was due on May 6, 1987. He owed $90,-900.00 on this loan to Union National Bank of Colorado ("Union National Bank") as of that time. In May 1987, Union National Bank began collection activities.[3]

Sheehan's method of operating was to attempt to conceal his assets. Sheehan was familiar with bankruptcy proceedings at this time since, in 1985 or 1986, a company he owned, Wooden Nickel, Inc., had been forced involuntarily into bankruptcy. Sheehan Testimony; *see* USA Ex. 323 (Transcript from Sheehan's Section 341 Meeting of Creditors), at 102.

Sheehan had represented to United Savings that his net worth in 1985 was $5.7 million. USA Ex. 18.[4] He thus had a significant incentive to hide his assets. He testified at trial that he was afraid he would be sued personally if a plane he was piloting was in an airplane accident, since his employer, Continental Airlines, had changed its indemnity policies. He also stated that he wanted to be sure his former wife, Betty Olson Sheehan, did not get his property.[5]

Sheehan thereafter held virtually no assets in his own name. In or about April 1986, shortly after LMC was formed, Sheehan

$125,000.00 on January 27, 1989. USA Ex. 71, 71.1; Johannes Testimony.

**4.** There is evidence that Sheehan represented to Union National Bank that as of January 1985, his net worth was $6.185 million. Johannson Testimony.

**5.** Sheehan's lack of personal assets is evidenced by the documents connected to his bankruptcy. *See generally* USA Ex. 161, 323.

transferred title in 1514 So. Glenstone ("Glenstone Property") from himself to LMC. USA Ex. 93; Sheehan Testimony. Thereafter, LMC's principal business related to the ownership of two buildings in which restaurants operated.[6]

Sheehan's financial problems grew worse with time. On January 24, 1989, Sheehan confessed to a $125,000.00 judgment in a lawsuit brought against him by Union National. USA Ex. 71, 71.1.[7] By March or April 1989, Union National Bank began its attempts to garnish Sheehan's wages as a result of this judgment. USA Ex. 123. Sheehan counseled with Cully concerning the garnishment action and the Bank's efforts to seize certain assets located in Springfield, Missouri. USA Ex. 39; Sheehan Testimony. Sheehan also experienced several heart attacks and other health problems starting in mid 1988.

On May 29, 1989, Sheehan filed for bankruptcy protection under Chapter 7 in Houston, Texas. USA Ex. 128, 161. The Government's claim of forfeiture of the Defendant Property arises from fraud in which it contends Sheehan concealed his interest in various corporations and their assets over which he had control and beneficial ownership interests from the Bankruptcy Trustee, the Court and the estate's creditors.

### 4. Creation of LMC, Inc., Banner Advertising, Inc. and B & B Development, Inc.

Sheehan created LMC in April 1986. Michelle Sheehan acquired her interest in LMC in April 1986, when Sheehan gave her 100% of the corporation. Michelle Sheehan was 15 or 16 years old at the time of her "acquisition." M. Sheehan Testimony. She relied entirely on her mother, Carole, to read to her the documents she received on LMC and the other companies. She admits she did not listen or "pay much attention" when her mother discussed these matters with her. She had little recollection of events, although she claimed at trial to have been involved in decision making.[8] Michelle Sheehan had no business experience in general and no experience with restaurants in particular. M. Sheehan Testimony. She was involved in LMC's business to only a minor and purely ministerial extent. Her representations to this Court of material involvement are not credible.

In or about 1986 or 1987, Sheehan and his wife at the time, Betty Olson Sheehan, separated. On or about June 6, 1987, in a Legal Separation and Property Settlement Agreement with Betty Olson Sheehan, Sheehan became the owner of all of the stock in various corporations including, but not limited to, all of the stock in both Banner Advertising, Inc. ("Banner") and B & B Development, Inc. ("B & B").

Banner had been incorporated under the laws of the State of Missouri on November 30, 1981. B & B, formerly, Clearwater Development, Inc. ("Clearwater"), had been incorporated under the laws of the State of Missouri on December 30, 1974. Prior to

**6.** As of September 18, 1987, LMC's assets were a restaurant building located at the Glenstone Property in Springfield, Missouri and a mortgage on a restaurant building located in Notch, Missouri. It appears that, during the times relevant to this case, family members of Sheehan or one of his former wives ran these restaurants (which were held in a different corporation).

**7.** Sheehan now contends that his attorney acted without his authority. During an evidentiary hearing in March 1995, Judge Lee Rosenthal, the previous presiding judge in this case, ruled that the Stipulation was binding. See Doc. # 55. Given this Court's assessment of Sheehan's trial testimony and his counsel's explanations, this Court finds that Sheehan's claim is not credible. Sheehan similarly contends that the stipulation of probable cause in this case was entered into by a different attorney without authority. He contends that if he failed to make any disclosures, it was his bankruptcy attorney's fault. He contends that his corporate attorney, Cully, is responsible for all corporate affairs. Sheehan's pattern of blaming others or disclaiming all personal responsibility for decisions in which he clearly was involved is not credible and provides no legally valid excuse for his behavior.

**8.** Michelle Sheehan's earlier comments—during her FBI interview in 1993 (while she was assisted by counsel), or in 1995 at a hearing in this case before Judge Lee Rosenthal, or in 1995 at her deposition in this case—reveal that in fact she was totally uninvolved with LMC, Banner, or B & B and merely signed whatever Cully asked her to sign.

July 7, 1987, Sheehan owned all of the stock of Banner and B & B. From a time prior to June 6, 1987, until at least early May 1989, Sheehan served as President of LMC, Banner and B & B. As of July 7, 1987, Banner's assets were a lake house in Barry County, Missouri, a house near Rogersville, Missouri, and a Stearman aircraft. Cully, Sheehan, and Ross Testimony. As of July 7, 1987, B & B's assets were a farm in Barry County, Missouri and assorted farm equipment. *Id.* The B & B farm consisted of approximately 300 acres of land. Ross estimated that at the time of the July 7, 1987 Agreement, the Banner lake house was worth $300,000, and the B & B farm was worth $500 per acre, or $150,000. Sheehan's estimate of the value of the lake house was double Ross' estimates.

## 5. Sheehan's Purported Transfers of Ownership of Banner and B & B to Ross

By an agreement dated July 7, 1987, Ross acquired a 100% interest in Banner and at least a 90% interest in B & B. Each Ross and Sheehan now claim that the transfer was a gift from Sheehan.[9] Ross and Sheehan Testimony; USA Ex. 2, 3. The agreement, as prepared by Cully, stated that the transfer from Sheehan to Ross was in consideration for Ross' release of all claims that he had arising from the loss of his investment of approximately $150,000 in Sheehan's company, Wooden Nickel, Inc., which had been

forced into bankruptcy in or about 1986. *See* USA Ex. 2, 3.[10]

Sheehan and Ross have testified inconsistently as to whether or not the transfer agreement was a binding contract. USA Ex. 343, 344. Ross testified that he participated in these transactions as a favor to his friend, Sheehan, and did not receive his interest in Banner and B & B, and later LMC, as consideration for the release by him of a potential claim against Sheehan for a prior failed investment.[11] Ross Testimony. This is contrary to Sheehan's divorce proceeding testimony and his testimony in his own Bankruptcy Case. *See* Sheehan Testimony.

Sheehan testified that in July 1987, he and Ross agreed that Ross would exchange his interests in Banner, B & B and other entities for a 50% interest in LMC. USA Ex. 4, 5; Answer, ¶ 17. Ross and Sheehan testified that they agreed Ross would get involved with these companies on the condition that a lawyer would be involved to do the legal work and handle all communications among officers and shareholders, that Sheehan would stay actively involved for 5 years, and that Ross would not have to deal with Sheehan's former wives. There is no writing that supports this testimony. The parties' agreement reflecting the transfer of 50% of LMC's shares to Ross for 100% of Banner and B & B's stock from Ross seems to have been executed on September 18, 1987. There is

---

**9.** Sheehan never paid gift taxes nor filed a gift tax return. Sheehan Testimony. Indeed, the IRS has no record of, and Sheehan cannot produce, Sheehan's 1987 personal income tax return. USA Ex. 282.1.

**10.** On May 19, 1987, Ross filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Western District of Missouri, Southwestern Division. *See* USA Ex. 342. After his acquisition of Banner and B & B, Ross did not disclose to the Bankruptcy Court his interest in Banner or B & B, or their respective assets. Ross, both in his explanation as to why he did not disclose his interest in Banner and B & B during his bankruptcy proceeding, and in explaining at trial his involvement in Banner, B & B and LMC, stated that he took the stock as a favor for his friend Sheehan. In his answer to an adversary complaint filed by the Chapter 7 trustee in Ross' bankruptcy proceeding, Ross, through his attorney Arch Skelton, denied that the documents through which he acquired interests in Banner, B & B and LMC

were "contracts" and denied "that the Parties ever intended to be legal (sic) obligated." USA Ex. 343. The Bankruptcy Court adopted this theory in Ross' bankruptcy case. *See* USA Ex. 344.

**11.** This confusion was caused by the suggestion by Cully that Ross should include the language about his releasing his claims in the July 7, 1987, agreement in order to create the appearance that Ross gave consideration for Sheehan's transfer of the stock of two companies (Banner and B & B) to him. Cully, Ross and Sheehan's testimony are consistent on this point. This does not place Cully in a favorable light. It is not the attorney's place to suggest consideration that does not exist in the clients' minds. Even assuming LMC's witnesses' explanation is accurate—that this language was inserted as Cully's idea to protect Ross from potential claims by his wife should they divorce—Cully's credibility suffers from the suggestion that he would include a false recitation in an agreement among parties.

no explanation given as to why Michelle Sheehan, the 100% owner of the LMC stock, according to Sheehan's testimony, would agree to this transfer; she received nothing in return for the loss of 100% control over LMC's assets. There is no evidence that there was any discussion with Michelle Sheehan prior to the execution of the July or September 1987 agreements. Ross and Sheehan agreed that all communications concerning LMC, Banner or B & B would be through their attorney, Cully. The documents establish that this is the course that was in fact followed.

Sheehan and Ross testified that Sheehan gave Ross these companies (and their assets) so Sheehan could provide for Michelle Sheehan after he died. Sheehan testified that he wanted to prevent his estranged wife, Betty Olson Sheehan, from getting the property. He had recently been diagnosed with diabetes and testified that he believed he was likely, according to his family's pattern, to suffer heart attacks as a result.

Sheehan's explanations lack credibility. While he may have been justifiably concerned about his health, his purported concerns about his former wife are spurious, since he had just reached a formal and final property settlement with her by which he received full ownership of the corporations. The Court is persuaded that Sheehan's true concerns were his deteriorating financial condition, as explained below. If Sheehan truly wanted to provide for his daughter Michelle Sheehan, he easily could have used a traditional method of estate planning, such as creating a trust for her benefit, with an appropriate independent trustee. It is questionable whether Ross would have been asked to serve such a role, since Ross possessed no financial acumen or experience in commercial real estate, which constituted a substantial part of the assets of LMC and its subsidiaries, Banner and B & B. Instead, Sheehan designed the transactions to permit, and even to require, according to the testimony of Ross and Cully, that Sheehan remain in control of the assets while divesting himself of formal ownership. Sheehan never explained why he opted for such a complex arrangement.

Therefore, the Court finds that Sheehan transferred the Banner and B & B stock to Ross to prevent Sheehan's creditors from reaching his assets, and to attempt to place the asserts outside his bankruptcy estate, should he decide to file.

## 6. *Sheehan Retained Control of Operations of LMC, Banner and B & B*

Ross' involvement in LMC, Banner and B & B's business affairs was, like that of Michelle Sheehan, at all times minimal. Neither the LMC Board of Directors nor shareholders ever had a meeting that Ross or Michelle Sheehan attended. Cully, Ross, Michelle Sheehan and Sheehan all testified that Cully (as attorney for Sheehan, LMC, Banner and B & B) ran the businesses, in that he prepared formal documentation when it was needed. Cully would call Ross as needed, and Ross signed virtually all documents Cully sent to him. Ross did not make business policy decisions, and orally approved decisions suggested by others. There is no evidence Ross ever declined to do what he was asked. He was not consulted on certain matters, such as a proposed real estate swap that Sheehan was trying to arrange in October 1988 to divest LMC of certain real estate in exchange for commercial property in Nashville, Tennessee. *See* USA Ex. 51. The only connection that this proposed property had to LMC was that it was located near the residence of Jean Adkinson, Sheehan's girlfriend and future wife, at the time.

It is undisputed that for the years 1987 and 1988, Sheehan was the president of LMC. USA Ex. 28. For the year 1987, Sheehan was a member of LMC's Board of Directors. USA Ex. 28. For the year 1988, Sheehan was the only member of LMC's Board of Directors. USA Ex. 28. For the years 1987 and 1988, Sheehan was also the president of Banner and was the only member of Banner's Board of Directors, and was the president of B & B and the only member of B & B's Board of Directors. USA Ex. 29, 30.

Ross testified that he had significant contact with Cully in the process of managing the LMC affairs, since Ross and Sheehan testified that by design they never talked

directly to each other concerning the operation of LMC. They had agreed that all communications related to LMC would go through Cully.[12] Ross' claim of significant involvement was belied by his answers on cross examination and is not borne out by the written record. During the period July 1987 through September 1989, when Sheehan and Ross testified that they were seeking to sell the real property holdings of LMC, Banner and B & B (allegedly in order to liquidate the companies' assets and make them more productive), there is only *one* written communication between Cully and Ross. In this communication, a September 29, 1988 letter by Cully to Ross, Cully stated "I have not written or called you in many weeks, if not many months." USA Ex. 48. Moreover, before the filing of Sheehan's bankruptcy proceeding on May 26, 1989, Cully's billing records contain no mention of Ross with regard to the operation of LMC, Banner, B & B, or their respective assets. USA Ex. 39.

The trial evidence leads the Court to find that, from July 1987 through April 1989, if not longer, Sheehan made all major decisions concerning the use and disposition of assets nominally titled in the names of LMC, Banner and B & B. USA Ex. 334, 337, 338; Yates, Cully, Sheehan, Ross, M. Sheehan Testimony.

From July 1987 through at least April 1989, Sheehan personally received the benefits of all assets nominally titled in the names of LMC, Banner and B & B. USA Ex. 109–111; Cully, Ross, M. Sheehan and Sheehan Testimony. Neither Ross nor Michelle Sheehan received any benefit arising out their purported ownership of LMC, Banner and B & B at any time. Ross and M. Sheehan Testimony.

### 7. Sheehan's Purported Resignation From All Corporate Positions

Sheehan claims he resigned as an officer and director of Banner, B & B, and LMC effective May 1, 1989, four weeks before his Chapter 7 bankruptcy filing. LMC introduced in evidence a purported resignation which recites that it is effective May 1, 1989. LMC Ex. 9A. The Court questions this document's authenticity. Unlike all other documents relating to LMC, there is no credible evidence that Cully or an attorney prepared this document, and if it was prepared by Cully or his staff, nothing about it convinces the Court it was prepared prior to May 1, 1989. The signature is undated, and the document recites that it is effective on May 1, 1989, which suited Sheehan's purposes in light of his need to file bankruptcy to try to halt the intrusive collection efforts being made, by Union National Bank particularly, since March 1989. The document is an exceptionally poor copy. In addition, the corresponding Consent by the LMC Board of Directors, signed by Michelle Sheehan and Ross, bore signatures that were not dated, and neither of these witnesses could state with any precision when he or she signed it. *See* LMC Ex. 9B. In its original interrogatory answers, LMC stated that it had no "specific memory as to the date" when it learned of Sheehan's resignation. USA Ex. 19.

Both before and after the stock transfers to Ross, and before and after Sheehan's purported resignation as President of LMC, Banner and B & B, he continually exercised virtually total dominion and control over the assets of these three entities, and the proceeds of these assets. It was his long term strategy to market and sell these companies' real estate assets. Sheehan was a signatory on bank accounts in the name of LMC. USA Ex. 104, 173.3. Ross concurred in this approach since he did not want to be involved in the business of the companies.

### 8. Sheehan's Use of Corporate Property for His Own Purposes Prior to His Bankruptcy

Sheehan used the assets of LMC, Banner and B & B for his benefit and to suit his desires. The lake house (ostensibly owned by Banner) was at one time the personal residence of Sheehan, his then wife Carole Sheehan, and their daughter, Michelle Shee-

---

**12.** They each testified that this was because Ross did not want his wife, a good friend of Sheehan's former wife, Betty, to know anything and he did not want to appear to be siding with Sheehan over Betty, with whom he and his wife remained friendly.

han. Prior to its sale in November 1989, the lake house's last known occupant was Sheehan. Neither Michelle Sheehan nor Ross ever lived in it after it was transferred to Banner.

On December 15, 1987, Banner conveyed the lake house to Sheehan and his then wife, Betty Olson Sheehan. USA Ex. 24. Three days later, on December 18, 1987, the Sheehan's conveyed the lake house back to Banner. USA Ex. 26. The General Warranty Deed was not filed until almost a year later, on September 13, 1988, within one year of the filing of the bankruptcy petition at issue in this case. Sheehan testified that he conveyed the property because United Savings Bank refused to renew the loan if the property was held in the name of Banner, but the Bank agreed to refinance the existing loan if legal title to the property were placed temporarily in his and his wife's names. Sheehan's testimony was unclear as to whether he considered himself personally liable for the loan thus created. There is no evidence that he or LMC made payments on it until the property was sold in 1989.

Other examples of the dominion and control Sheehan exercised over the LMC and its subsidiaries' assets follow. On October 12, 1988, Sheehan authorized Maurice Burlison, a Springfield real estate broker, to "act on *my* behalf as to all matters regarding *my* real estate holdings." USA Ex. 53 (emphasis added). Among the properties covered by Sheehan's agreement with Burlison was the lake house, whose record owner was Banner, and the farm purportedly owned by B & B. *Id.* On December 6, 1988, Sheehan wrote a letter, responding to an offer to purchase the Banner lake house by writing "your offer is not acceptable to *me*" and further observing that "*I* dropped *my* listing price $75,000.00 below what I felt an appraiser would appraise this property for in today's market." USA Ex. 63 (emphasis added). Sheehan now

denies he wrote this letter. Sheehan's disclaimer is not credited by this Court. A notation at the bottom of the December 6, 1988 letter states "LAS/nh." The initials "LAS" refer to Larry Allen Sheehan; the initials "nh" refer to Nancy Horton, who was Cully's secretary in 1988. Cully Testimony. Cully denied preparing the December 6, 1988 letter or preparing the letter for Sheehan's signature. Cully's billing records indicate that he had an office conference with Sheehan on December 6, 1988. USA Ex. 39.

United Savings posted the lake house (owned ostensibly by Banner) for foreclosure on two occasions—on or about September 15, 1988, and on or about April 10, 1989. USA Ex. 45, 89. Sheehan claimed that he did not know about United Savings' threats of foreclosure on the lake house after August 1988 because, as a result of a heart attack he had suffered in August 1988, Jean Adkinson, Tom Johnson (who was hired to manage the day-to-day affairs of LMC, Banner and B & B) and Cully refused to give him his mail. This assertion lacks credibility since, on January 14, 1989, Sheehan forwarded under cover of a handwritten letter two checks to United Savings that he personally signed to bring his loan current. USA Ex. 66. Moreover, Ross had no knowledge of either threat of foreclosure against the lake house and there is no evidence of anyone acting on behalf of a corporation. Ross Testimony. Thus, Sheehan's testimony that he was unaware of United Savings' threats of foreclosure and uninvolved in the affairs of LMC or Banner is not credible.

LMC guaranteed the fees for legal services rendered to Sheehan in his personal capacity by Cully's law firm. Legal services rendered to LMC, Sheehan personally, and other business ventures associated with Sheehan were billed to one account at Cully's law firm; no effort was made to separate responsibility for these billing matters.[13]

**13.** Another example of Sheehan's lack of credibility is his testimony of his dealings with Bo James Company, Inc. ("Bo James Co."). On April 7, 1988, Sheehan and James filed for the patent as inventors of a fishing lure that Sheehan testified he developed. The patent for the lure was assigned to Bo James Co., and was issued on December 19, 1989. USA Ex. 61, 62. On January 16, 1990, Sheehan and James filed for a patent as inventors of a tackle box holder, which patent was issued on March 19, 1991, and was assigned to Bo James Co. USA Ex. 295. Nevertheless, Sheehan denies any ownership interest in Bo James Co. This denial is belied by the documents. There are two different sets of minutes of "First Meeting of Board of Directors" for

After July 1987, a building at 1514 So. Glenstone, Springfield, Missouri ("the Glenstone Property"), was owned by LMC. Sheehan's role in the sale of this property is illustrative of the central position he played throughout as to LMC, Banner and B & B. Sheehan testified that he had been trying to sell that property and all the real estate owned by LMC, Banner and B & B, but in the late 1980's there was a very depressed market. Sheehan testified that his role in the sale of the Glenstone Property in April 1989 was limited to depositing the proceeds of the sale into a bank account in a Kansas City suburb and dividing the proceeds pursuant to instructions from others. However, Cully testified that Sheehan was his primary contact concerning the sale of the Glenstone Property. For instance, Cully obtained initial approval of the terms and price of the sale from Sheehan. When Cully received the contract for sale on February 17, 1989, he forwarded it via Federal Express to Sheehan. USA Ex. 79. Cully's billing records for the period February 14, 1989 through April 17, 1989 show contact with Sheehan by letter or telephone on 22 days, including the following entry on April 17, 1989, the day of the closing of the Glenstone Property: "several calls to Larry; to closing on the Glenstone Property." During the same time period, there are *no* references in Cully's billing

records to either Ross, Michelle Sheehan, or Carole Sheehan. USA Ex. 39.

Finally, on April 17, 1989, LMC sold the Glenstone Property for a total of $500,000. Answer [Doc. # 79], ¶ 23; USA Ex. 102, 321. The net proceeds of $84,713.58 from the sale of the Glenstone Property were deposited into an LMC account over which Sheehan had check writing authority. USA Ex. 107, 321.[14] On April 19, 1989, Sheehan caused three checks to be cashed against LMC's account that used almost all of the net proceeds: (i) an unnumbered check in the amount of $40,727.77, payable to "Commerce Bank," which references three cashiers checks; (ii) check no. "002" in the amount of $4,477.36, payable to "Commerce Bank/Larry Sheehan," which references four other cashiers checks; and (iii) check no. "003" in the amount of $37,006.00, payable to "Commerce Bank/Larry Sheehan," which references "money orders." USA Ex. 108, 321 (and documents referenced therein).

Much of the $40,727 used to purchase cashiers checks from Commerce Bank was for the benefit of Sheehan or those he owed: $10,000.00 was paid to Tom Johnson, manager of LMC, for the sum due under his Agency Agreement with LMC (of which Ross and

---

Bo James Co., one dated November 1988 (signed by Sheehan) and one undated set. USA Ex. 54, 55. *See also* USA Ex. 67 (Letter of Cully dated January 19, 1989 and attached minutes); USA Ex. 235.1 (Waiver of Notice of First Meeting of Board of Directors of Bo James Co., signed by Sheehan and James). Both sets allocate 45 shares of Bo James stock to Sheehan, 45 shares to John R. James ("James") and 10 shares to Cully. A signature card for Commerce Bank account number 11–625–4, dated January 24, 1989, shows authorized signers for the account are James and Sheehan. USA Ex. 73. A handwritten note from James to Cully states that because "Betty was entitled to claim half of Larry's shares ... we decided it would be better to put Larry's shares in Jean Adkinson's name." USA Ex. 60. Records of Missouri Secretary of State show that Larry Sheehan was the secretary and a director of Bo James Co. for the years 1988 and 1989. USA Ex. 33.1. Legal work to obtain these patents was performed during 1988–90 by Michael Godar, a St. Louis, Missouri patent attorney. Sheehan paid Godar's legal bills out of the proceeds of the sale of LMC property. *See infra* at 1193.

14. At Sheehan's direction, Tom Johnson took a cashier's check in the amount of $84,713.58 to Commerce Bank of Clay County, near Kansas City, Missouri, where he was met by Michelle Sheehan. USA Ex. 334 (Johnson Depo.), at 61–63. On April 18, 1989, the day after the sale, Michelle Sheehan executed a Certificate of Resolution of Corporate Board of Directors, opening an account at Commerce Bank of Clay County in the name of "LMC Investments, Inc." Although Michelle Sheehan testified that she signed signature cards and blank checks, there is no documentary evidence to support this testimony. Indeed, all tangible and bank record evidence is to the contrary. The only individual designated as an authorized signer on the account was "Larry Sheehan." USA Ex. 104, 105. The signature card for this LMC account bears Sheehan's driver's license number, not Michelle Sheehan's. USA Ex. 104. Finally, there is no evidence of any checks signed by Michelle Sheehan ever being negotiated through the account. The Court finds that even if Michelle Sheehan opened an account, it was not the account into which the Glenstone Property proceeds were deposited.

Michelle Sheehan knew little if anything); [15] $24,032.15 was paid to Cully for undifferentiated legal fees for LMC, Sheehan and the other corporations; $3,000.00 was paid David Sesserman, an attorney who rendered services to Sheehan in his individual capacity in the lawsuit filed by Union National Bank in Colorado; and $3,687.62 was paid to Michael Godar for work done for Bo James Co. USA Ex. 71.1, 109, 321. The disbursement to Michael Godar was not authorized by Ross, LMC's president, or Michelle Sheehan, neither of whom seemed to know anything about it. Ross and M. Sheehan Testimony.

In addition, almost $5,000 in personal obligations of Sheehan, such as bills for medical and legal services, were paid out of the proceeds of the Glenstone Property sale. *See* USA Ex. 109–111.[16] Sheehan (and/or Jean Adkinson, his girlfriend/wife) received at least three $10,000 checks payable to him from the proceeds.[17] The Court therefore finds that Sheehan's testimony concerning the limited nature of his involvement in the sale of the Glenstone Property is not credible and is not supported by the evidence.

Sheehan's total control over LMC, and thus its assets including its subsidiaries, is further evidenced by the fact that Sheehan was a signatory on bank accounts in the name of LMC, including one account that had been opened in late April, 1989 (within a month of his bankruptcy filing) on which he was sole signatory. USA Ex. 104, 173.3. These accounts were not disclosed in Sheehan's bankruptcy. USA Ex. 161.

Another mechanism used by Sheehan to benefit those he chose and not the shareholders of LMC was to arrange through Cully for Johnson (LMC's recently hired manager), Jean Adkinson (Sheehan's girlfriend and later wife), and LMC to enter into an "Agency Agreement," effective January 27, 1989, in relation to the sale of the Glenstone Property. USA Ex. 75. According to LMC documents,[18] Adkinson was paid pursuant to the Agency Agreement for suggesting that the Glenstone Property be offered for sale to a neighbor, who at that time already held a right of first refusal on it, and who owned all the surrounding land. Other than this alleged suggestion, Adkinson performed no services in connection with the sale. USA Ex. 348 (J. Adkinson Deposition), at 51–53. Adkinson and Johnson are not now and have never been licensed real estate brokers. USA Ex. 348 (J. Adkinson Deposition), at 51; *see* USA Ex. 327, 328, 334. Neither are entitled to receive real estate commissions under Missouri law for services rendered as a real estate agent. Cully Testimony. Other than the transaction involving the Glenstone Property, Adkinson has no other experience in real estate.[19] USA Ex. 348. Ross knew

---

15. *See infra* at 15. Tom Johnson, who was also a party to the Agency Agreement, has no knowledge of the services provided by Adkinson and believed that the decision to offer the property to the neighbor originated with Michael Cully.

16. The LMC check no. "002" made payable to "Commerce Bank/Larry Sheehan" was disbursed as follows: $3,483.47 payable to Cox Hospital and $472.68 payable to Ferrell Duncan (for Sheehan's medical treatments), $225.00 payable to Mary Tinor and $288.21 payable to Empire Gas. USA Ex. 110, 321; Sheehan and P. Geboski Testimony.

17. One of the $10,000 checks was negotiated by Sheehan on April 26, 1989 as the initial deposit into an account in the name of Jean Adkinson at Firstbank of Aurora, Colorado. USA Ex. 111. After being endorsed by Sheehan and bearing Sheehan's driver's license number as identification, the check was negotiated by Adkinson at Firstbank on July 10, 1989, some 44 days after Sheehan filed for bankruptcy. USA Ex. 111, 114. Another of Sheehan's $10,000 checks was apparently transferred to Johnson, after being endorsed by Sheehan, on or about September 4, 1989, eleven days after Sheehan had been confronted at his Rule 2004 bankruptcy exam concerning the existence of bank accounts in his name. USA Ex. 111.

18. It does not appear to the Court that Ross was aware of the Agency Agreement at the time it was signed.

19. It appears that Jean Adkinson received a total of $20,000 in 1989 in connection with the sale of the Glenstone Property but these funds were not reported by her as income to the Internal Revenue Service until April 27, 1993, approximately three weeks after this lawsuit was filed. USA Ex. 285. Adkinson used the proceeds of the $20,000 commission to pay Sheehan's bankruptcy counsel's fee. USA Ex. 319; USA Ex. 348 (J. Adkinson Deposition), at 86. It thus appears that her so-called Agency Agreement was a cover for Sheehan to receive funds from the LMC Glenstone Property sale.

little about the services provided by Adkinson in connection with the sale. Jean Adkinson's receipt of a fee as a result of the Glenstone Property sale thus is further evidence of Sheehan's use of LMC for his personal benefit, rather than for the benefit of the shareholders or for his daughter.

The Court therefore finds incredible Sheehan's testimony that he did not control the distribution of the proceeds from the sale of the Glenstone Property.[20]

Ross and Michelle Sheehan's testimony support the conclusion that Sheehan orchestrated and then received much of the benefit of the Glenstone Property sale. Ross testified that Sheehan was contacted whenever decisions needed to be made regarding the sale of that Property, including price. Ross never discussed with Michelle Sheehan the adequacy of the price for the Glenstone Property and she could recall no information concerning the transaction. Ross and M. Sheehan Testimony.

Significantly, during the time Ross and Michelle Sheehan both owned LMC stock, until in or about 1995, Ross *never* spoke to or conferred substantively with Michelle Sheehan about LMC, despite the fact that she turned 18 in August 1988. Finally, despite their record ownership of 100% of the LMC stock, neither Ross nor Michelle Sheehan received *any* of the proceeds from the sale of the Glenstone Property. USA Ex. 102, 103.

### 9. *Sheehan's Bankruptcy*

On May 26, 1989, Sheehan filed a voluntary petition for bankruptcy under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Case No. 89–03977–H1–7. Answer, ¶ 6; USA Ex. 128. The bankruptcy resulted from Union National Bank's efforts to garnish Sheehan's wages and its other collection efforts, which were commenced after the Bank obtained a judgment in late January 1989. *See* USA Ex. 39, 123. In his initial filing, Sheehan listed assets of only $10,350.00. USA Ex. 128, 161. This was in stark contrast to the financial statements he had submitted to United Bank in 1985 and 1987 showing $5.7 million and $4.7 million net worth.[21] According to Sheehan's schedules, he owed his secured creditors $163,363.89, and he owed his unsecured creditors $284,477.69. USA Ex. 161.

Sheehan's initial filing did not list Banner, B & B, LMC or their respective properties (including the lake house and the farm) as assets. USA Ex. 128, 161. Sheehan's initial filing also did not disclose his indebtedness on the United Savings note which was secured by the lake house. USA Ex. 128, 161. On August 8, 1989, Sheehan filed schedules of assets and liabilities in his bankruptcy proceeding. USA Ex. 161. Despite a direct question concerning business associations during the past six years, Sheehan did not disclose in his schedules or statements of affairs his involvement with Banner, B & B, or LMC. *Id.* Sheehan did not disclose his ongoing attempts to sell the lake house and the farm. *Id.* Sheehan did not disclose the disbursements paid to him in April 1989 as a result of the sale of the Glenstone Property or that he was personally holding two of the checks on and after the date he filed his bankruptcy petition. *Id.* Sheehan did not disclose the fact that certain of his medical expenses and legal fees had recently been paid on his behalf as a result of the sale of the Glenstone Property. *Id.* Sheehan did not disclose any interest in any real property, including the Banner lake house and the B & B farm. *Id.*, Schedule B–1. Sheehan did not disclose that he was an authorized signer on

---

**20.** Aside from the deposit of $84,713.58, representing the proceeds of the sale of the Glenstone Property, and the disbursements described here, there were no other deposits, checks or material charges to the account during this period, except a $58.20 deduction for printed checks. USA Ex. 107.

**21.** Sheehan testified that he knowingly submitted to United Savings a false financial statement in 1987 and that he did so because the banker asked for it. He states that he told the banker that the statement was false but the banker "needed it for his files." He testified to this story believing that the statement was a copy of what he had submitted in 1985; he was unable to explain the fact that the 1987 one was substantially different from the earlier statement. The Court does not credit Sheehan's explanation of his submission of the 1987 statement, and cannot discern any viable defenses to this conduct.

the LMC account at Commerce Bank, or on LMC's account at Mercantile Bank. *Id.* Sheehan did not disclose the pending patent application for the fishing lure he had invented, or his interest in Bo James Co., the nominal owner of the product. *Id.*

Further evidence of Sheehan's intent to hide assets from the Bankruptcy Trustee, Steven Smith, was introduced by the United States. On November 6, 1989, Linda Kearney, a legal assistant to the Trustee, wrote to Ross, as president of LMC, and requested that LMC produce bank records for the period May 24, 1989 through July 26, 1989. USA Ex. 196. On January 4, 1990, Cully drafted a response to Kearney's letter for Ross' signature, which Ross signed. Ross refused to produce the requested bank records, and stated: "After having reviewed these documents, we are at a loss as to why you wish to review these materials. I am curious to know what the bank records of LMC Investments, Inc. has to do with your proceeding." USA Ex. 199, 201; Cully, Ross, Johannes and Smith Testimony.

Only Union National Bank, which had a judgment against Sheehan, sought to have its claim exempted from discharge. *See generally* LMC Ex. 12d. No other creditor sought such relief, and no creditor otherwise protested the granting of the discharge. Eventually the Union National Bank claim was settled and the Bankruptcy Court approved the settlement on August 14, 1991. LMC Ex. 12d and 12j. Sheehan contends that he was carefully and fully examined in pursuant to Bankruptcy Rule 2004 and during the Section 341 Meeting of Creditors (*see* USA Ex. 323 (transcript of Rule 2004 exam); *cf.* LMC Ex. 12e), as well as during two separate depositions about his past involvement with LMC and its subsidiaries. The Court cannot fully assess the intensity of these examinations, the degree of detail Sheehan provided, or the forthrightness with which he answered the questions posed, since the deposition transcripts are not in evidence. The Government disputes the characterizations of LMC's counsel and Sheehan on this issue.

Sheehan's Bankruptcy Trustee, Steven Smith, conveyed that everyone believed this to be virtually a "no asset" case. He explained that he spent only a few minutes questioning Sheehan at the Section 341 Creditors Meeting (or the Rule 2004 Examination) and did not spend extensive time on the matter generally, because of the statements by Sheehan that there were only approximately $10,000 in assets. Smith filed a "no asset" report on March 8, 1993, believing it to be the end of that bankruptcy case. LMC Ex. 12a. The Court disagrees with Sheehan's characterization of the Rule 2004 Examination, however. *See* USA Ex. 323. The Court finds that Sheehan's responses were vague, incomplete and confusing.

Moreover, Smith apparently did not consider Sheehan's disclosures to be adequate. When the United States Attorney later informed Smith about the matters raised in the case at bar, Smith immediately took action to continue Sheehan's bankruptcy case in an open status. USA Ex. 348, 349. Smith testified during the Government's rebuttal case at trial that he believes that Sheehan was incomplete in his bankruptcy disclosures. He stated also that creditors of the estate will receive the proceeds of this forfeiture if the Government is successful.

On April 9, 1993, without knowledge of Sheehan's continuing involvement with the LMC assets, the Bankruptcy Court granted Sheehan his discharge. At that time, there were no objections. LMC Ex. 11.

The Court finds, based on the testimony of the Bankruptcy Trustee, that he on behalf of the creditors of the bankruptcy estate was not made aware of the extensive and continuing involvement of Sheehan in the affairs of LMC, Banner and B & B, and the degree of control Sheehan maintained over their assets.[22]

10. *Sheehan's Continuing Domination of Corporate Affairs in 1989–90, Subsequent to His Bankruptcy Filing*

Sheehan remained involved in efforts to market the lake house and the farm after his

---

**22.** To the extent LMC contends that the Bankruptcy Trustee's intervention and settlement of a dispute over farm equipment owned by B & B constitutes a release of the United States' claim of forfeiture here, the Court rejects the argument as frivolous. LMC Ex. 12d, 12j, 12k, and 12*l*.

bankruptcy filing. Cully, Ross, Sheehan, Yates Testimony. Record title to the lake house was in Banner and record title to the farm was in B & B. On May 26, 1989, a real estate agent representing James and Margaret Bergtold (the "Bergtolds") forwarded to Sheehan a sales contract for "your" lake property. USA Ex. 129. On June 5, 1989, Cully forwarded to Sheehan the proposed contract on the lake house from the Bergtolds and stated that "we need to give some serious thought to what our counter offer should be." USA Ex. 138; Cully Testimony; Answer, ¶ 26. On June 12, 1989, Cully forwarded to Sheehan an "offer" to sell the lake house property to the Army Corps of Engineers. Cully instructed Sheehan to sign the instruments as "president." USA Ex. 143.[23] On August 4, 1989, the Bergtolds' real estate agent wrote to Sheehan as follows: "I know you are busy but I expected some reply from our offer. If you will not make a counter offer, then let me know and we will not take any more of your time." USA Ex. 159. Johnson responded as follows to the note:

Right now we have a problem with the Corp. over one boundary line and I can tell you all has been agreed to—but we do not have it in hand in writing, and *Larry* will not counter until a clear title could be presented if all parties were to come to an agreement.

USA Ex. 159 (emphasis added).

In his capacity as president of Banner, Sheehan executed annual registration reports for the years 1988 and 1989. USA Ex. 130. This was done on May 30, 1989, the day after his bankruptcy filing. On that day Sheehan, denominated president of Banner, also executed a Missouri Department of Revenue

Request for Tax Clearance of a Forfeited Corporation. USA Ex. 120, 126.[24] On June 1, 1989, Cully wrote to Sheehan concerning the need to get Banner, B & B, and LMC reinstated as Missouri corporations. He also forwarded to Sheehan a copy of the Petition to Quash Execution and Levy with respect to the seizure action brought by Union National Bank. USA Ex. 135. On June 15, 1989, Cully forwarded to Sheehan two copies of LMC's financial statement and requested that Sheehan provide information regarding LMC's assets. USA Ex. 145. On June 20, 1989, Cully wrote to Sheehan observing that: "I am pretty much dead in the water on Banner and B & B until I get the tax returns from John Yates. If you have not worked these matters out with him, you need to do so." USA Ex. 148. On July 12, 1989, Cully again wrote to Sheehan urging him to contact John Yates so that Banner, B & B, and LMC could be reinstated. USA Ex. 152. On July 19, 1989, Cully forwarded to Sheehan a "Durable Power of Attorney" which recited that Sheehan is president of Banner. USA Ex. 153; Answer, ¶ 26.

The weight of the credible evidence establishes that Sheehan continued to concern himself with the finances of LMC. On June 21, 1989, Cully forwarded to Sheehan a past due notice for an LMC loan owed at Mercantile Bank. USA Ex. 149. Nevertheless Sheehan used LMC as his personal financial institution. On June 7, 1989, Sheehan instructed Cully to pay $3,300.00 to Michael Godar (a debt of Bo James Co. or of Sheehan personally) from Cully's firm's account and assured him that reimbursement would be forthcoming from LMC.[25] Cully complied

---

**23.** Cully took the position that Sheehan had to continue to act as president until the corporate charter of Banner was reinstated, since Sheehan had been the president when the charter was forfeited for non-payment of franchise taxes. There is no evidence that this was ever explained to Sheehan's bankruptcy attorney in connection with his bankruptcy.

**24.** Cully, on behalf of Sheehan and LMC, asserted at trial that Sheehan's signature as President was required under Missouri law on these reinstatement documents because he was the president of the company at the time of the forfeiture of the corporate charter. He cited no authority to the Court for this proposition. Even if this is

a valid explanation, which the Court questions, this ambiguity in Sheehan's role should have been explained to Sheehan's bankruptcy attorney.

**25.** Sheehan's involvement with Bo James Co. did not end when he filed bankruptcy. On June 15, 1989, despite the fact that Sheehan had not disclosed any interest or connection to Bo James Co. in his bankruptcy petition or schedules, Cully mailed a signature card for Commerce Bank to Sheehan for Sheehan's execution. USA Ex. 147. On June 29, 1989, having received the signature card back from Sheehan, which Sheehan had executed in his capacity as secretary of Bo James Co., Cully forwarded the completed signature

with this request. USA Ex. 139, 140. In its original interrogatory answers, served on the United States on or about June 26, 1994, LMC stated that it did not authorize the expenditure of $3,300.00 to Godar and that "Mike Godar presumably provided legal services to Larry Sheehan for an unrelated matter." USA Ex. 19. This is borne out by an August 1, 1989 letter from Godar to Sheehan enclosing "*your* United States patent application." USA Ex. 156.

Sheehan denied at trial having opened his correspondence except as given to him by Cully or Jean Adkinson. This representation is not material since the weight of the evidence at trial establishes that Sheehan saw the above-noted correspondence and acted on it. Cully and Sheehan Testimony. The evidence of record—both the documents and the witnesses' testimony—establishes convincingly that LMC, Banner and B & B minimally followed corporate formalities, kept faulty records of corporate meetings and actions, and were not in good standing with the Secretary of State of Missouri for extended periods. USA Ex. 28–30; 202, 207–209, 330; Cully Testimony. Sheehan and his agents, Cully and Johnson, repeatedly stated that Sheehan personally owned or was personally responsible for assets nominally titled in the names of LMC, Banner and B & B, including the lake house and the farm, the proceeds of which were used to purchase the Defendant Property. USA Ex. 18, 34, 43, 47, 53, 63, 65, 66, 69, 70, 76, 78, 83, 85, 94, 96, 129, 138, 139, 143, 149, 153, 159, 232.1, 249, 250 and 258.

**11. *Events Subsequent to Sheehan's Bankruptcy Filing***

**A. *The Sale of the Lake House and the Farm***

In October 1989, the Bergtolds executed real estate purchase agreements to pay almost $500,000 for the purchase of the lake house and the farm property. Cully Testimony. The sale of both parcels to the Bergtolds closed on November 22, 1989.

Each Michelle Sheehan and Ross was aware of and approved the sales, and signed documents in order for the sales to proceed. LMC Ex. 13a; Ross and M. Sheehan Testimony. Each also approved the purchase of the Defendant Motor Coach. *See* LMC Ex. 13f; Ross and M. Sheehan Testimony. Neither of LMC's shareholders or directors, Ross and Michelle Sheehan, however, was aware of the details of how the proceeds, other than those used for the purchase of the Defendant Property, were spent or allocated. *Id.* In fact, of the total $491,639.67 paid by the Bergtolds for the farm and lake house, $152,337.15 was used to pay off the United Savings note executed by Sheehan which encumbered the lake house. USA Ex. 322; Answer, ¶ 30. The net proceeds of the two sales—a total of $332,318.52—were deposited into Cully's law firm trust account, USA Ex. 322; Answer, ¶ 31, and were used to purchase the Defendant Property.

**B. *Purchase, Use and Operation of the Motor Coach Exclusively by Sheehan***

Ross and Michelle Sheehan each testified that they thought it a good idea to sell the real estate of LMC, Banner and B & B. Ross stated that he wanted LMC to buy a motor coach because he believed it would be a good investment that would not depreciate. Nothing in the record indicates where he got this idea. Indeed, the aggressive depreciation to be taken over five (5) years according to CPA Yates, once he was informed that LMC owned the Defendant Property, is directly contrary to Ross' concept. Ross never checked about his investment strategy with Cully, his and the corporation's counselor, or with Michelle Sheehan, the person whose financial situation he and Sheehan purportedly were trying to benefit.

There is no dispute that each Ross, Michelle Sheehan and Cully knew about the purchase of the Defendant Property prior to LMC's use of the funds, at least to the extent that each signed documents approving the

---

card for the account to Commerce Bank. USA Ex. 150. This involvement is not directly material to the forfeiture action because the non-disclosure of this asset did not give rise to proceeds

that the Government seeks to forfeit. The evidence about Bo James Co., however, is relevant to Sheehan's credibility.

purchase using the sales proceeds of the lake house and the farm.

Ross stated that he wanted Sheehan to shop for a motor coach because Sheehan had experience in such purchases, having previously owned a motor coach through Clearwater, a predecessor to B & B. Ross and Sheehan Testimony. Sometime in 1989, Sheehan located a motor coach he wanted LMC to purchase, the Defendant Property, and met Glen Patch in Tahoe, Nevada to inspect it.[26] Sheehan testified that he committed to purchase the Defendant Property after consulting with Ross. Prior to purchasing the Defendant Property, neither Ross nor Sheehan consulted with Michelle Sheehan on the matter, despite her 50% ownership in LMC and their use of LMC property to purchase the Defendant Property.[27] Neither Ross nor Michelle Sheehan has ever received any of the proceeds from the sale of the lake house or the farm. M. Sheehan and Ross Testimony; USA Ex. 322. In fact, Sheehan testified that it was not until after this case was filed that he met with Michelle Sheehan and explained details about the purchase of the Defendant Property and the structure, purpose and operations of LMC. M. Sheehan Testimony. Sheehan did the same with Ross after this case was filed. Ross Testimony. Neither Ross nor Michelle Sheehan has received compensation of any type, including dividends or distributions of property, from either LMC, Banner, or B & B. USA Ex. 262–279.

On or about November 22, 1989, the day the funds were received from the title company on the real estate sales, Cully signed a check in the amount of $286,075.00 from his firm's account to purchase a wire transfer in the same amount, payable to Marathon Coach in Eugene, Oregon, for the purchase of the Defendant Property. USA Ex. 322; 19; 21.

■ Sheehan oversaw the purchase and refurbishment of the Defendant Property. Sheehan Testimony. Sheehan is the only person who used the Defendant Property from the time LMC acquired it; he used it at *his sole option* for years, and may have used it as his sole residence during some of that time. Sheehan attempted to conceal his involvement by having the funds flow from Cully's law firm account. He also concealed any connection to the Defendant Property by using Oregon and Colorado addresses for LMC on the purchase paperwork. The purchase order states that LMC's address is 13502 E. Asbury, Aurora, Colorado, which at the time was the home address of Jean Adkinson, and was also a former residence owned by Larry Sheehan. USA Ex. 190.[28] A second purchase order for the Defendant Property states that LMC's address is 1902 N.E. 38th Avenue, Portland, Oregon. USA Ex. 191, at 2. Rather than signing his own name to the work orders at Marathon Coach, Sheehan signed Jean Adkinson's name, purportedly because the work was ordered in her name and therefore it was the only name Marathon would accept. Sheehan Testimo-

---

26. The Government argues that Sheehan attempted to conceal his identity when he was shopping for the motor coach. The seller, Glenn Patch, testified by deposition that Sheehan represented to Patch that his name was "Larry Atkins," that he was a Continental Airlines pilot, that he intended to retire from Continental in the very near future, and that he intended to live in the motor coach afterwards. USA Ex. 338 (Patch Deposition). However, the deposition has been contradicted by other evidence introduced by LMC and the Court gives it little, if any, weight.

27. It appears that when she was interviewed by the Federal Bureau of Investigation ("FBI") in 1993, Michelle Sheehan did not know that the Defendant Property had been purchased with the proceeds of the sale of the Banner lake house and the B & B farm. M. Sheehan Testimony.

28. Further evidence of Sheehan's intent to hide assets from the Bankruptcy Trustee was his purported transfer of this property in Aurora, Colorado to Jean Adkinson. Sheehan stated that he gave it to Adkinson in May 1987, as reflected on quitclaim deed, but the deed was not recorded until January 1989, within 4 months of his bankruptcy filing. USA Ex. 312. The weight of the expert testimony in evidence is that the date of recordation is the relevant date for bankruptcy purposes since it is then that the transferee obtains title with priority over the Bankruptcy Trustee, and that therefore the transfer should have been reported by Sheehan in his bankruptcy schedules. The contrary opinion held by Sheehan's bankruptcy counsel is viewed with great skepticism by this Court.

ny. Sheehan's explanation is farfetched at best, since he testified that the Marathon representative talked on the phone to Adkinson before allowing him to sign. There is no credible explanation as to why Sheehan could not sign his own name after that call, except that he did not want to be associated in writing with the Defendant Property. Finally, the address used by LMC for the motor vehicle registration of the Defendant Property was and continues to be at an address in Portland, Oregon that has no connection to LMC or its business. USA Ex. 320. LMC never has explained this unorthodox conduct.

Sheehan and Jean Adkinson had exclusive possession of the Defendant Property from the time it was purchased in November 1989 until its seizure in April 1993. Sheehan, Ross, and M. Sheehan Testimony. Ross estimated at trial that he has been a guest of Sheehan's on the Motor Coach for three or four days on several occasions, usually when he visited Sheehan. Ross Testimony. Likewise, Michelle Sheehan estimated at trial that she had seen the Motor Coach on only one or two occasions

### C. Compensation by Sheehan for Use of the Motor Coach: Reimbursement of Expenses

LMC's position in this lawsuit is that the Defendant Property was leased to Sheehan in exchange for his paying the insurance, maintenance, and expenses associated with the Defendant Property. LMC therefore maintains that this was an arm's length transaction and it is an "innocent owner" of the Defendant Property. The "lease" to which LMC refers was an oral agreement between LMC and Sheehan concerning use of the Defendant Property. Ross stated that he agreed to allow Sheehan to use the motor coach in exchange for covering all insurance and expenses, since the coach otherwise would lay idle and LMC could not pay the maintenance and storage expenses. The evidence does not bear out the contention that

Sheehan was leasing the Defendant Motor Coach in a commercially reasonable arrangement. Sheehan and others testified that he paid an imputed rent for use of the Defendant Property of $1,000 or $1,200 per month. Yates, Ross, Cully and Sheehan Testimony.[29]

Ross and Sheehan explained the oral lease by stating that prior to late November 1989, LMC had income in the form of installment payments on one or more promissory notes from BRANSCO, Inc. and its owners Andrew Bray and Ed Wall. However, on January 4, 1990, BRANSCO filed for Chapter 11 bankruptcy. At or about that time, Bray and Wall ceased payments as well. Therefore LMC's sole sources of income terminated, leaving LMC without revenue of any sort. In addition, in mid-December 1989, Ross learned that he had cancer, which caused him to lose all interest in LMC.

In or about December 1989, Sheehan took delivery of the Defendant Property from Marathon Coach. LMC introduced no evidence as to why it did not take the obvious step of selling or at least listing the Defendant Property, the Motor Coach, for sale while it was still new and in excellent, indeed mint, condition. Instead, Ross stated that he, as LMC's representative, decided to let Sheehan use the Motor Coach in exchange for payment of all its expenses.

The only documentation provided to the Government, or to LMC's accountant for tax preparation, concerning the terms of the so-called "lease" are two handwritten pieces of paper, one of which is labeled "Bus Lease" and one of which is labeled "Expenses," both of which were prepared by Larry Sheehan. USA Ex. 249, 250; Yates and Sheehan Testimony.

The "lease payments" allegedly made by Sheehan were exclusively disbursements for expenses associated with the operation of the Defendant Property, the Motor Coach. USA Ex. 249, 250; Sheehan, Ross and Yates Testimony.[30] There is no dispute that Sheehan

---

**29.** The inability of Ross or Michelle Sheehan to identify with any certainty the market rental rate is just one of many strong indications of the lack of veracity of LMC's explanation.

**30.** The United States states that LMC did not produce USA Ex. 249 and 250 when LMC made its production in response to the Government's Request for Production of "all documents concerning the Defendant Property as well as all documents concerning the upkeep and operation

(possibly with Jean Adkinson's help) paid expenses associated with the Defendant Property from the time LMC acquired it until it was seized by the Government. Sheehan, Ross and Yates Testimony; USA Ex. 250; *see* USA Ex. 307, 307.1. The issue is how much in fact was paid by Sheehan and Adkinson. According to the only documentation provided by Sheehan to LMC's tax preparer, Yates, for his proof of payment of rent and expenses, Sheehan made "lease payments" totaling $20,200 at the rate of $1200 per month for several months per year, in the following amounts: $3,600 in 1990; $4,600 in 1991; $8,200 in 1992; and $3,800 in 1993. USA Ex. 249.[31] Sheehan claims that he incurred expenses of $21,410 for the Defendant Property on behalf of LMC. USA Ex. 250.

The two documents prepared by Sheehan first were provided to LMC's accountant and tax preparer, Yates, several years after most of the expenses were incurred. Prior to that time, Yates did not know that LMC claimed to own the Defendant Property. LMC failed to file any tax returns for the years 1987 through 1992 until after this lawsuit was commenced. LMC filed its 1987 tax return on November 27, 1994, and returns for 1988 through 1992 were filed on December 22, 1994. USA Ex. 262–267.[32] Yates was not provided with Ex. 249 and 250 until 1994, when he belatedly prepared LMC's, Banner's, and B & B's tax returns. Yates Testimony. These returns were not prepared until after this action was commenced. In addition, there is slim documentary back-up for Sheehan's handwritten notes. USA Ex. 249 and 250. While claiming to have paid $20,000 in expenses over a four year period, LMC (and Sheehan) submitted a mere $7,000 in receipts. Moreover, the veracity of some

of these receipts and their connection to this case is questionable. There appear to be duplicates and some have no indication that they pertain to the Defendant Property.

The Court also is unpersuaded by LMC's claim that it used Defendant Property for public commercial purposes. The evidence simply does not support this contention. The balance sheets filed by LMC with the Missouri Department of Revenue for the years 1989, 1990 and 1991 do not list the Defendant Property as a corporate asset. USA Ex. 255–257; Yates Testimony. In addition, even assuming that the Defendant Motor Coach was leased to Sheehan at the rate of $1,000 to $1,200 per month, as Sheehan testified, the daily rate of such a rental would be only $35–$40 per day. Sheehan, Yates and Ross Testimony. In contrast, the Government established through its motor coach expert that the fair market rental of Defendant Property during the time period in issue, 1990 through 1992, was approximately $400 to $550 per day. Middaugh Testimony. Thus, there is no basis on which to conclude that there in fact was a rental arrangement between LMC and Sheehan.

Rather, the Court finds that there was never any truth or economic substance to the claim that LMC was in the business of leasing the Defendant Property to the public.[33] LMC received no revenue, invited no public use, advertised to no one about the Motor Coach's availability, paid no expenses, and maintained no records in connection with the Motor Coach's use. The Defendant Property never was leased to the public and was not used in pursuit of any trade or business by LMC. Moreover, for the annual periods commencing December 1, 1990, December 1, 1991, and December 1, 1992, the only insured driver with respect to the Defendant Proper-

---

of the Defendant Property by Larry Sheehan" and were in fact not produced to the United States until March 1996. During Sheehan's deposition, he affirmatively represented that he had no documents related to the Defendant Property.

**31.** Counsel for LMC stated, and some of the matters filed with the Court reflect, that the monthly lease rate was $1,000. Until trial, the figure of $1,200 was not mentioned. This adds to the Court's skepticism as to the lack of an arm's length basis for this transaction.

**32.** Tax returns for Banner and B & B for the years 1989 through 1992 were filed on September 21, 1993, approximately five months after this lawsuit was initiated. USA Ex. 268–279.

**33.** There is no factual basis for LMC to claim the Motor Coach as a business expense with the associated aggressive depreciation schedule it has claimed on its tax returns. *See* USA Ex. 255–257.1, 264–267, 307.1; Thurmond Testimony.

ty was Jean Adkinson, USA Ex. 245–248, and in a "Motor Home Renewal Questionnaire," completed on or about December 3, 1990, Adkinson represented that the Defendant Property was *not* used for business purposes. USA Ex. 245. In fact, the Motor Coach was used solely for the convenience of Sheehan.

The Court finds, based on the foregoing, that LMC and Sheehan concealed Sheehan's links to the Defendant Property in numerous ways. Nothing in the trial record gives rise to the inference that LMC had the right to take commercial business deductions or to depreciate the value of the Defendant Property.

Sheehan's use of Defendant Property was further illustration of his attempt to hide his property from his creditors.

### 12. *LMC's Witnesses Lack Credibility or Are Not Disinterested*

The Court carefully observed the demeanor and testimony of all the witnesses in this trial and the foregoing represents the Court's considered judgment of their credibility. To the extent any witness's testimony is inconsistent with the foregoing findings, the Court has rejected that testimony as lacking credibility or as inconsistent with the documents created at the time of the events in issue.

As stated above and indicated throughout the foregoing, the Court finds that Sheehan lacks credibility as to the reasons for his creation of and his involvement in LMC, Banner and B & B. The Court does not credit the timing on his purported May 1, 1989 resignation as an officer of all these companies. The Court finds incredible Sheehan's supposed lack of knowledge as to the use of the proceeds of the sale of the lake house and the farm, as well as the proceeds of the Glenstone Property, which was sold immediately before Sheehan's bankruptcy filing. The Court is entirely unpersuaded by Sheehan's testimony that he did not intend to secret or conceal his assets from the Bankruptcy trustee, the Bankruptcy Court and the estate's creditors. The Court finds that the preponderance of the evidence establishes that Sheehan did intend to hide his assets from these entities. Finally, the Court finds that Sheehan knowingly converted the lake house and the farm, a portion of the concealed assets, to negotiable instruments or funds for the purpose of acquiring the Defendant Property and for maintaining it.

The Court also finds some of Ross' testimony to lack credibility as discussed in the foregoing sections of this opinion. The Court notes that at trial, Ross at first represented that he prepared a seven-page document outlining the history of LMC, Banner, and B & B. Upon further questioning, he admitted that the document had in fact been prepared by Sheehan. Ross Testimony; USA Ex. 258. Other evidence reveals that Ross did not know or care to know about the details of the business matters in which Sheehan and LMC were involved. His testimony that he was doing a favor for a friend, Sheehan, by serving as president and shareholder of LMC is consistent with the Court's view that LMC was created as a tool for Sheehan's personal purposes. Ross simply went along, signing whatever Sheehan, through Cully, requested.

The Court finds that Michelle Sheehan was basically truthful in her testimony that she was involved only to a limited extent, that she knew little if anything about what LMC did during the years 1986 through 1993, and that she did not care to know at the time. Her willingness to sign whatever she was asked and her basic lack of concern continued after she reached the age of majority. Her testimony on substantive matters evidenced a clear desire to help her ailing father, despite her lack of knowledge of the facts. Her lack of substantive involvement in LMC's affairs and those of its subsidiaries fully supports the Court's conclusion that LMC and its subsidiaries were not created to benefit her, but were designed to satisfy the personal financial goals of her father, Sheehan, *vis a vis* his own creditors.

Cully, counsel for Sheehan, LMC, Banner and B & B, is not a disinterested witness in this case. He (like Jean Adkinson, Sheehan's current wife) is a shareholder in Bo James Co. and possibly other businesses started by Sheehan. Cully's lack of disinterestedness is evident from the fact that he and his firm

represented LMC and Sheehan in connection with many of the transactions involved in this action. Cully's incentive to justify all his clients' conduct is influenced by his concerns regarding the propriety of advice he presumably gave the clients at the time.

The Court finds that the testimony of Yates and the other witnesses is largely credible, to the extent not inconsistent with the foregoing findings of fact.

### CONCLUSIONS OF LAW

#### 1. *Jurisdiction.*

This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1331, 1345, and 1355. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1395(a) and (b), and 1355(b)(1). The United States, through the United States Attorney for the Southern District of Texas, is authorized to bring this action pursuant to 18 U.S.C. § 981.

#### 2. *The Law of Forfeiture Generally.*

■ The Supreme Court has established that *in rem* civil forfeiture is a remedial civil sanction, distinct from potentially punitive *in personam* civil penalties such as fines, and does not constitute a punishment under the Double Jeopardy Clause. *United States v. Ursery,* —— U.S. ——, ——, 116 S.Ct. 2135, 2142, 135 L.Ed.2d 549 (1996); *Gore v. United States,* 357 U.S. 386, 392, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958).

In reaching this conclusion, the Supreme Court stated that "[b]oth 21 U.S.C. § 881 and 18 U.S.C. § 981, which is entitled 'Civil forfeiture,' provide that the laws 'relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws ... shall apply to seizures and forfeitures incurred' under § 881 and § 981." *Ursery,* —— U.S. at ——, 116 S.Ct. at 2147(citing 21 U.S.C. § 881(d); 18 U.S.C. § 981(d)). The Court stated that Congress clearly intended that forfeiture under Sections 881 or 981 would be a proceeding *in rem,* targeting the property itself. " 'In contrast to the *in personam* nature of criminal actions, actions *in rem* have traditionally been viewed as civil proceedings, with jurisdiction dependent upon seizure of a physical object.' " *Id.* (quoting *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 363, 104 S.Ct. 1099, 1105, 79 L.Ed.2d 361 (1984)).

The *Ursery* Court focused on and reaffirmed the applicable procedures:

19 U.S.C. § 1615, which governs the burden of proof in forfeiture proceedings under § 881 and § 981, provides that once the Government has shown probable cause that the property is subject to forfeiture, then 'the burden of proof shall lie upon [the] claimant.'

*Id.* at —— – ——, 116 S.Ct. at 2147–48 (quoting *89 Firearms,* 465 U.S. at 363, 104 S.Ct. at 1105). The purpose of the forfeiture statutes was then described:

Most significant is that § 981(a)(1)(A), and §§ 881(a)(6) and (a)(7), while perhaps having certain punitive aspects, serve important nonpunitive goals. Title 21 U.S.C. § 881(a)(7), under which Ursery's property was forfeited, provides for the forfeiture of 'all real property ... which is used or intended to be used, in any manner or part, to commit, or to facilitate the commission of' a federal drug felony. *Requiring the forfeiture of property used to commit federal narcotics violations encourages property owners to take care in managing their property and ensures that they will not permit that property to be used for illegal purposes. See Bennis v. Michigan,* [—— U.S. ——, ——, 116 S.Ct. 994, 1000, 134 L.Ed.2d 68 (1996) ] ("Forfeiture of property prevents illegal uses ... by imposing an economic penalty, thereby rendering illegal behavior unprofitable"); *89 Firearms,* [465 U.S. at 364, 104 S.Ct. at 1106] (forfeiture "discourages unregulated commerce in firearms"); [*Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 687–688, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974) ]. In many circumstances, the forfeiture may abate a nuisance.

*Id.* at ——, 116 S.Ct. at 2148 (emphasis added).

■ There is no requirement in the statutes reviewed by the Supreme Court in *Ursery* that the Government demonstrate *scienter* in order to establish that the property is

subject to forfeiture. Indeed, the Court stated that "the property may be subject to forfeiture even if no party files a claim to it and the Government never shows any connection between the property and a particular person." *Id.* at ——, 116 S.Ct. at 2149.

█ In this case, LMC contends that no crime occurred, that the showing of probable cause by the Government is insufficient to warrant forfeiture, and that the Government must prove the crime. However, LMC is incorrect that the Government must prove the crimes of bankruptcy fraud or money laundering were committed. In a case involving drug forfeitures under 21 U.S.C. § 881(a)(6) and (a)(7), the Fifth Circuit held that after the Government establishes probable cause, the burden shifts to the Claimant to establish by a preponderance of the evidence that "the property was not used for illegal activity or that the owners were 'innocent.'" *U.S. v. Land, Property Currently Recorded in Name of Neff,* 960 F.2d 561, 563 (5th Cir.1992) (citing *United States v. One 1986 Nissan Maxima GL,* 895 F.2d 1063, 1065 (5th Cir.1990)). The same procedure should apply in this case brought under § 981(a)(1)(A). *See United States v. All Assets of G.P.S. Automotive Corp.,* 66 F.3d 483, 487 (2d Cir.1995); *United States v. Daccarett,* 6 F.3d 37, 57 (2d Cir.1993), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994); *United States v. 4492 South Livonia Road,* 889 F.2d 1258, 1267 (2d Cir. 1989); *United States v. Eleven Vehicles,* 836 F.Supp. 1147, 1153 (E.D.Pa.1993).

### 3. *LMC Lacks Standing to Contest The Forfeiture of the Defendant Property.*

█ Standing to contest a forfeiture is "literally a threshold question for entry into a federal court" and "the Court must consider standing of any party even if the issue has not been raised by the parties to the action." *United States v. One 18th Century Colombian Monstrance,* 797 F.2d 1370, 1374 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987). Claimant, in a forfeiture action, bears the burden of showing that he owns or has an interest in the forfeited property. *United States v. $20,193.39 U.S. Currency,* 16 F.3d 344, 346

(9th Cir.1994). A party seeking to challenge a forfeiture must "'demonstrate an interest in the seized item sufficient to satisfy the Court of its standing to contest the forfeiture.'" *United States v. One 1978 Piper Navajo PA–31 Aircraft,* 748 F.2d 316, 319 (5th Cir.1984) (quoting *United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars ($364,960.00) in United States Currency,* 661 F.2d 319, 326 (5th Cir.1981)).

█ Bare legal title by one who does not exercise dominion and control has been held insufficient to establish ownership. *One 1978 Piper Navajo PA–31 Aircraft,* 748 F.2d at 319. *See United States v. One 1945 Douglas C–54 (DC–4) Aircraft,* 604 F.2d 27, 28 (8th Cir.1979), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 294 (1982); *United States v. One 1982 Porsche 928,* 732 F.Supp. 447, 451 (S.D.N.Y.1990) (Connor, J.) (citing numerous cases). The reason for this is that "appearances may be manipulated and deceptive." *1982 Porsche,* 732 F.Supp. at 451. Ownership may be proven by actual possession, dominion, control, title and financial stake. *Id.* Thus, a search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the "real" owner or merely a "strawman" set up either to conceal illegal dealings or to avoid forfeiture. *Id.; United States v. 427 Chestnut St.,* 731 F.Supp. 183, 191 (E.D.Pa. 1990) (car held to be "owned" by person who expressed most interest at time of purchase, who ordered the optional features, who paid the bulk of the purchase price, who paid for garage space, and who drove the car shortly after its purchase; person with legal title was "no more than a nominal owner"; "real owner" was held to be the person who had the "high financial stake" in the car and who would suffer from its loss); *United States v. $280,505 Dollars,* 655 F.Supp. 1487, 1495 (S.D.Fla.1986); *United States v. One 1981 Datsun 280ZX,* 563 F.Supp. 470, 474–476 (E.D.Pa.1983).

█ A claimant's burden to prove standing arises prior to the United States' burden to prove probable cause. *One 18th Century Colombian Monstrance,* 797 F.2d at 1374. In determining whether the ownership

interest asserted by a claimant is genuine, courts have examined a number of factors, including actual possession, control, title, and financial stake. *One 1945 Douglas C–54 (DC–4) Aircraft,* 647 F.2d at 866. These indicia are consulted in an effort to discover what party exercised dominion and control over the seized property. *United States v. One 1988 Honda Accord,* 735 F.Supp. 726, 728 (E.D.Mich.1990); *Ramaria Familienstiftung v. United States,* 643 F.Supp. 139, 144–45 (S.D.Fla.1986).

▮▮▮ The Court concludes that LMC lacks standing to assert a justiciable interest in the Defendant Property. The Court bases its finding on the following factors:

(a) Sheehan had exclusive possession and control of the Defendant Property for the period November 1989 through April 1993;

(b) There was no written lease for Sheehan's use of the Defendant Property and there were no lease payments made to LMC, the putative owner;

(c) Sheehan paid for all expenses associated with the Defendant Property without justifying or reporting them to LMC at the time they were incurred; [34]

(d) No reports of the expense payments were made to LMC until 1994, when it was necessary to file tax returns for reasons related to this forfeiture action (USA Ex. 249, 250);

(e) LMC never billed Sheehan for any rental fee for his use of the Defendant Property;

(f) Sheehan supervised the refurbishment and all maintenance of the Defendant Property;

(g) Neither Ross nor Michelle Sheehan were carried as insured drivers on the vehicle;

(h) Corporate tax returns for the years 1989, 1990, 1991, and 1992, which should reflect a proper accounting for the income, expenses, and depreciation associated with the Defendant Proper-

ty, were not filed until 1994, well after this lawsuit was initiated;

(i) Confusion surrounds Ross' acquisition of the property used to purchase the Defendant Property, as Ross was in the midst of his own bankruptcy proceeding at the time and has admitted that he failed to disclose his interest in the lake house and the farm, which are directly traceable to the Defendant Property.

Courts have held that claimants lacked standing under similar circumstances. *United States v. One 1981 Datsun 280ZX,* 563 F.Supp. 470 (E.D.Pa.1983) (claimant rarely operated vehicle, vehicle referred to as belonging to son, son negotiated purchase, and "considerable confusion" surrounded who paid for vehicle); *United States v. One 1982 Porsche 928,* 732 F.Supp. 447 (S.D.N.Y.1990) (claimants rarely operated vehicle and never provided funds for expenses); *United States v. 427 Chestnut Street,* 731 F.Supp. 183 (E.D.Pa.1990) (claimant neither negotiated sale of the car nor operated it).

This Court holds under the unusual circumstances presented here that LMC, while record title owner, in fact lacks sufficient interest in the Defendant Property to assert a claim in this proceeding.

In an exercise of caution, and since a full trial on the merits was held, the Court hereby also issues rulings on the merits of the forfeiture claim and LMC's defenses.

### 4. *Elements of the Statutes in Issue.*

▮▮▮ Section 981(a)(1)(A) of Title 18 of the United States Code renders forfeitable any property "involved" in a transaction or attempted transaction in violation of federal money-laundering laws embodied in 18 U.S.C. § 1956 "or any property traceable to such property."

A person violates § 1956(a)(1)(B)(i) if he or she

(i) conducts or attempts to conduct a financial transaction;

---

34. Later, Sheehan (or LMC, in connection with this litigation) produced proof of expenses that Jean Adkinson claimed she paid for insurance, maintenance, and gas for the Defendant Proper-

ty. These are reported to total approximately $7,000, but appear to contain duplicate charges. USA Ex. 307 (Dec.1989 expenses), 307.1.

(ii) knowing that the property involved is the proceeds of unlawful activity; and

(iii) knowing that the transaction was designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity."

*United States v. Willey,* 57 F.3d 1374, 1383 (5th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995). As used in 18 U.S.C. § 1956, the term "financial transaction" is defined in relevant part as "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means *or* (ii) involving one or more monetary instruments, *or* (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft ..." 18 U.S.C. § 1956(c)(4) (emphasis added). For purposes of 18 U.S.C. § 1956, only a minimal impact on interstate commerce is required. *United States v. Jackson,* 935 F.2d 832, 841 (7th Cir.1991) (transaction involving check drawn on a bank implicates interstate commerce); *United States v. Kelley,* 929 F.2d 582 (10th Cir.) (purchase of car affects interstate commerce), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991).

▮▮▮ Bankruptcy fraud in violation of 18 U.S.C. § 152 is a "specified unlawful activity" within the meaning of 18 U.S.C. § 1956. *See* 18 U.S.C. § 1956(c)(7)(D). A person commits the crime of bankruptcy fraud in violation of Section 152 when he "transfer[s] or conceal[s] property (i) knowingly, (ii) fraudulently, and (iii) in contemplation of a case under title 11 or with intent to defeat the provisions of title 11." *United States v. Willey,* 57 F.3d 1374, 1380 (5th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995). In the Fifth Circuit, proof of bankruptcy fraud under Section 152 requires a showing (1) that there existed a proceeding in bankruptcy; (2) that certain property or assets belonged to the bankruptcy estate; (3) that the debtor concealed such property from the trustee charged with control or custody of such property; and (4) that the debtor did so knowingly and fraudulent-

ly. Fifth Circuit Pattern Jury Instructions, § 2.10 (1990).

▮▮▮ As used in 18 U.S.C. § 981(a)(1)(A), the term "property involved in" includes the property which was actually laundered as well as any property used to facilitate the laundering offense. *United States v. Eleven Vehicles,* 836 F.Supp. 1147, 1153 (E.D.Pa. 1993) (citing cases); *United States v. Saccoccia,* 823 F.Supp. 994 (D.R.I.1993) *aff'd,* 58 F.3d 754 (1st Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996). *United States v. All of the Inventories of the Businesses Known as Khalife Bros. Jewelry,* 806 F.Supp. 648, 650 (E.D.Mich.1992); *United States v. Swank Corp.,* 797 F.Supp. 497, 500 (E.D.Va.1992); *United States v. Certain Accounts,* 795 F.Supp. 391, 396 (S.D.Fla. 1992); *United States v. All Monies,* 754 F.Supp. 1467, 1472–73 (D.Haw.1991). The legislative history also makes it clear that "property involved in" includes property used to facilitate money laundering offenses. *Eleven Vehicles,* 836 F.Supp. at 1153. The *Eleven Vehicles* Court held that the nature of money laundering is a mixture of "innocent" funds with "guilty" funds in an attempt to cover up the latter. *Id.* Thus, the clean money serves as a tool to launder the ill-gotten money.

### 5. *Probable Cause.*

▮▮▮ In reliance upon the stipulation of probable cause entered into by the parties on or about October 3, 1994, the Court found that there was probable cause for the seizure of the Defendant Property. Doc. # 21. There was consideration given and the stipulation is binding on LMC, notwithstanding its arguments to the contrary. *See Quest Medical, Inc. v. Apprill,* 90 F.3d 1080, 1087 (5th Cir.1996). LMC waived, and is estopped from asserting that the United States lacked probable cause to commence or continue to prosecute this action.

▮▮▮ In an excess of caution, the Court considered the evidence adduced during the first two days of trial and made an independent determination that probable cause existed to seize the Property.[35] The Court here-

---

**35.** The Court's records are unclear as to whether this determination was made on the second day

by reaffirms this ruling. Ample evidence establishing probable cause for the seizure of Defendant's property was adduced through the Government's cross examination of Claimant LMC's first several witnesses.

■ Because probable cause has been found to exist for the seizure of the Defendant Property, the burden of proof has shifted to claimant LMC to come forward with evidence and to prove the defenses to the forfeiture on which it seeks to rely by a preponderance of the evidence. *United States v. 1988 Chevrolet Silverado*, 16 F.3d 660, 663 (5th Cir.1994); *United States v. Land, Property Currently Recorded in the Name of Neff*, 960 F.2d 561, 563 (5th Cir. 1992). There is no requirement that the United States demonstrate the elements of the forfeiture cause of action or the underlying crimes by a preponderance of the credible evidence or otherwise. *See Ursery,* ―― U.S. at ―――――, 116 S.Ct. at 2147–49. There is also no requirement that the Government demonstrate scienter as part of its burden of proving probable cause for forfeiture. *Id.* at ――, 116 S.Ct. at 2149.[36]

■ LMC presented evidence attempting to prove: (a) that Sheehan did not commit either bankruptcy fraud or money-laundering, the offenses on which this civil forfeiture is predicated, (b) that the property is not involved with the bankruptcy fraud or money laundering, and thus not forfeitable, and (c) the innocent owner defense or the defense that the Defendant Property was not derived from Sheehan's conduct. *See 1988 Chevrolet Silverado*, 16 F.3d at 663 (5th Cir. 1994); *Property Currently Recorded in the Name of Neff*, 960 F.2d at 563.[37] The Court holds that LMC failed to meet its burden of persuading this Court of any of its defenses.[38]

### 6. The Defendant Property is Forfeitable.

■ **A. Sheehan Committed the "Unlawful Activity" of Bankruptcy Fraud.—** LMC failed to meet its burden to show by a preponderance of the credible evidence that Sheehan did not violate 18 U.S.C. § 152. Indeed, the weight of the evidence strongly suggests that he did violate that statute. The Court relies on the foregoing findings of fact as its basis for this conclusion, but summarizes the salient points as follows:

As early as March 10, 1986, in a letter to United Savings, Sheehan expressed his intention to shelter his assets in corporations to place them beyond the reach of creditors. At that time, he and his former wife were obligated on a personal loan to Union National Bank of Colorado[39] which had matured

---

of trial, August 13, or early on the third day, August 14, 1996. No transcript is available at the time of issuance of this opinion.

**36.** LMC and Sheehan argue strenuously that Sheehan lacked scienter and did not intend to defraud anyone, and therefore that he has not violated either § 152 or § 1956. As noted above and in conclusions hereafter, these contentions are not persuasive in light of the findings made based on the evidence presented at trial. The circumstantial evidence in this case is overwhelming that Sheehan intended to conceal from his creditors and the bankruptcy court a variety of his assets, by placing them in the names of nominee corporations or friends. A fact finder frequently must rely on circumstantial evidence in assessing intent and state of mind in criminal and civil cases. *See United States v. Willey*, 57 F.3d 1374, 1382 (5th Cir.), *cert. denied*, ―― U.S. ――, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265–66 (5th Cir.1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992).

**37.** LMC insists on arguing without any legal authority that, in addition to the Government's initial responsibility to show the existence of probable cause for seizure of the Defendant Property, the Government bears the burden of proof on the elements of the bankruptcy, money laundering or forfeiture statutes. This contention is frivolous.

**38.** The evidence in this case was very strong that Sheehan intended to defraud the bankruptcy court and his creditors, and to engage in the financial transactions necessary to convert the proceeds of the sales of the farm and lake house to the Defendant Property without the knowledge of his creditors or the Bankruptcy Court. Therefore, even if the Government had the burden of proving by a preponderance of the credible evidence that each 18 U.S.C. § 152 and § 1956(a)(1)(A) had been violated, and that the requirements of 18 U.S.C. § 981(a)(1)(C) had been met as to the Defendant Property, the Court would hold that the Government had met these burdens.

**39.** Specifically, Sheehan and his former wife were obligated on a six month loan originally

after two six month extensions. Nothing had been paid on the loan, and $90,900 then was due. The evidence establishes that the loan went into default on or about May 8, 1986, and that Union National Bank began collection activities at that time.[40] LMC was formed in or about April 1986, and Sheehan shortly thereafter transferred record title to the Glenstone Property to LMC. USA Ex. 93; Sheehan Testimony. The Court has determined that the only discernable reason for this transfer and the purpose of LMC generally was to shield Sheehan's personal assets from potential creditors and later from the scrutiny of the bankruptcy court and interested parties.

In 1986 and 1987, aware that creditors could reach assets held in his name personally, Sheehan knowingly and fraudulently transferred record title to his assets into LMC, to Banner and B & B, and to Ross in order to conceal his continuing interest in those assets from his creditors. As described in detail above, he retained virtually total control and dominion over these assets thereafter. The concealment of his beneficial interest in LMC and its subsidiaries' assets was done in contemplation of a bankruptcy case under Title 11 of the United States Code.

The Court thus concludes that at the time of his transfer of these assets, and throughout the pendency of his bankruptcy case, Sheehan had beneficial interests in LMC, in LMC's assets, Banner and B & B, and the assets of Banner and B & B. These corporations' assets therefore were property of the bankruptcy estate. Smith and Askanase Testimony; *see also* Hensley Testimony.

From July 1987 though April 1993, Sheehan made all major decisions concerning the use and disposition of these assets, despite the fact that they were nominally titled in the names of LMC, Banner and B & B. During this same period, Sheehan received personally the benefits of all these assets. *See, e.g.,* USA Ex. 109–111; Cully, Ross, M. Sheehan, and Sheehan Testimony. From July 1987

through April 1993, neither Ross nor Michelle Sheehan received any benefit arising out of their purported ownership of LMC, Banner and B & B. M. Sheehan and Ross Testimony. Only Sheehan lived in the lake house from July 1987 until November 1989, when it was sold. Ross Testimony. Personal obligations of Sheehan, such as bills for medical and legal services were paid out of the proceeds of the sale of the Glenstone Property, even though that property was nominally titled in the name of LMC. USA Ex. 109–111. Sheehan was a signatory, and in some cases the sole signatory, on LMC's various bank accounts. USA Ex. 104, 173.3.

Nevertheless, from May 29 when he filed his Chapter 7 bankruptcy petition, through August 1989 when he filed his supporting materials, Sheehan did not disclose in writing any interest or involvement in LMC, Banner or B & B, or their assets. USA Ex. 128, 161; Smith, Hensley and Askanase Testimony. At his Rule 2004 Examination (*see* Bankruptcy Rule 2004), he was vague in his answers about each of the assets he had listed on his personal financial statements. A review of the transcript reveals numerous inconsistencies between Sheehan's explanations at trial before this Court and the answers to questions posed by his creditors in 1989. *See* USA Ex. 323. For instance, Sheehan claimed that he "sold" to Ross the interest in Banner (and B & B) through which Ross received his 50% ownership in LMC for the $156,000 that Ross allegedly had paid earlier. This is inconsistent with Ross' testimony in his own bankruptcy and at trial, where he stated that Sheehan had obligation and there was no sale. Ross Testimony; USA Ex. 342, 343, 344. Sheehan fails to explain why the debts on this property remained in his name. He does not demonstrate that the lenders were aware of the transfer of title. Sheehan did not commit during his Section 341 Meeting or the Rule 2004 Examination whether the loans in fact were being paid by the corporations or by him personally, if at all.

---

made in or about May 1985, which had been extended for six months on two occasions. R. Johannes Testimony.

**40.** On January 27, 1989, Union National Bank obtained a stipulated judgment for $125,000. USA Ex. 71, 71.1; Johannes Testimony.

Sheehan knowingly and fraudulently concealed from his bankruptcy attorney, Nathan Hensley, and from the Bankruptcy Court and the Bankruptcy Estate Trustee, Steven Smith, the degree of control and his current and past interest in the assets of LMC, Banner and B & B. Sheehan did not disclose his interest in the lake house in Eagle Rock, Missouri and the farm in Barry County, Missouri. Bare legal title to the lake house was in Banner and bare legal title to the farm was in B & B or its predecessor, Clearwater, at relevant times. Thus, Sheehan should have disclosed the existence of these assets in his bankruptcy schedules and statements of affairs.

LMC argues that Sheehan did not have the intent to conceal assets, and that he was forthright and answered all questions fully in the Rule 2004 Examination and in depositions taken during the bankruptcy case and adversary proceeding by Union Bank. The latter transcripts were not introduced in evidence in the trial, but the Court's review of the Rule 2004 Examination establishes that, to the contrary, Sheehan was imprecise and vague. He displayed an almost cavalier attitude in his lack of recollection and failure to produce documents to assist his creditors. He created a complex corporate maze, apparently maintained few if any records, and then stated that he could not recall without seeing the necessary paperwork—which he had not produced.[41]

Despite Sheehan's claim of lack of any interest in these assets, when they were sold in November 1989, he obtained virtually all the benefits from the proceeds.

Sheehan exercised exclusive dominion and control over the Defendant Property from its acquisition in November 1989 until April 1993 when it was seized. Ross and Sheehan Testimony. Sheehan and Adkinson paid all expenses in connections with the Defendant Property and had exclusive use of it while it was nominally owned by LMC. *See* USA Ex. 328; Ross, Yates, and Sheehan Testimony. There was no factual or legal justification for the imputed rental income claimed by LMC. The evidence purporting to support LMC's position that an oral lease existed in connection with Sheehan's use of the Defendant Property was created after this case was filed in April 1993. USA Ex. 249, 250, 257.1, 264–267, 347; Yates, Sheehan, and Geboski Testimony. There is no legitimate accounting or federal income tax basis for the treatment by LMC as to the Defendant Property. There was no effort by LMC to lease the Defendant Property to the public, to advertise to the public, or to maintain records to demonstrate a legitimate business purpose by LMC for the Defendant Property. Ross and Yates Testimony. LMC did not attempt to collect revenue, pay expenses or even maintain contemporaneous records of the use and expenses of the Defendant Property. *Id.* The handwritten notes that allegedly are the recap of the so-called oral lease revenues and expenses was created by Sheehan in late 1994 (after this case had been pending for over 1½ years) and provided to Yates, the LMC accountant, with no documentary support whatsoever.

The true economic substance of the so-called oral lease of the Defendant property is that Sheehan was personally financially responsible, and LMC was not, for all matters pertaining to the Defendant Property, that the expenses related to the Defendant Property were personal expenses of Sheehan and not business expenses of LMC.[42]

Each of these failures to disclose or efforts at concealment was material to Sheehan's violation of Section 152.

▃▃▃ The sales of the lake house and farm were to generate liquid assets and to purchase the Defendant Property. The pro-

---

**41.** In this context, the refusal by Cully and Ross to produce information on LMC, when requested by the creditors, is suspect. Cully's explanation for this position was weak at best, and Ross had no opinions on the matter and no idea about any facts.

**42.** This arrangement, at least at the time Sheehan sought to have LMC file tax returns claiming the Defendant Property as an asset in 1994, represented nothing more than an attempt by Sheehan to build a record to establish LMC's purported ownership and to use depreciation and other "business" expenses to generate a tax loss and obtain a cash refund from the IRS. *See* Thurmond Testimony.

ceeds from the sale of the lake house and farm are proceeds of Sheehan's violation of 18 U.S.C. § 152.[43]

**B. Sheehan Violated the Money Laundering Law.**—The foregoing findings of fact also lead the Court to conclude that LMC failed to prove that Sheehan did not violate Section 1956(a)(1)(B)(i), the money laundering statute. The Court concludes that the weight of the evidence suggests strongly that Sheehan engaged in a "financial transaction" to convert the assets concealed from the Bankruptcy Court and Trustee to funds and then into the Defendant Property, and that he knew that the funds used to purchase the Defendant Property were proceeds derived from violations of the law, within the meaning of 18 U.S.C. § 1956(a)(1)(B)(i). *United States v. Willey,* 57 F.3d 1374, 1384, 1387 (5th Cir.), *cert. denied* —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995); *United States v. Lombardi,* 5 F.3d 568, 570 (1st Cir.1993) (defendant committed underlying mail fraud, thereby establishing that he knew that laundered funds were criminally derived). Sheehan knew also that the transactions in which LMC, Banner and B & B engaged were designed to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" of the bankruptcy fraud, within the meaning of Section 1956(a)(1)(B)(i). *See Willey,* 57 F.3d at 1384, 1387.[44]

When Banner and B & B's assets, over which Sheehan had exercised domination and control, were sold in November 1989, the proceeds first were deposited with a title company. The net proceeds of $332,318.52 then were deposited into Cully's law firm trust account at Commerce Bank in Springfield, Missouri. Immediately, a check in the amount of $286,075.00 was written and used to purchase a wire transfer in the same amount (less a $10 service charge) to First Interstate Bank in Eugene, Oregon. The wire transfer was credited to the bank account of Marathon Coach, also in Eugene, Oregon, for the purchase price of the Defendant Property. USA Ex. 191, at 21. None of these proceeds or transactions were disclosed to the Bankruptcy Court, the Chapter 7 Trustee, or the estate's creditors. Sheehan's use of others' bank accounts to make the purchase of the Defendant Property is evidence of his knowingly engaging in a financial transaction and concealing the disposition of the proceeds of the assets over which he previously had control. This transaction and its concealment coupled with the fact that Sheehan was, with the most minor exceptions, the only person to use the Defendant Property, establishes his intent to violate § 1956(a)(1)(B)(i). Such intent is further evidenced by the fact that, in 1989 when

---

43. The Court notes that Sheehan committed other violations of the bankruptcy fraud statute in failing to disclose his indebtedness to United Savings; failing to disclose that his obligations under the United Savings note were paid by third parties; and failing to disclose that his indebtedness under the United Savings note had been extinguished.

44. To summarize, Sheehan participated in the following financial transactions knowing that the property involved in such financial transactions constituted the proceeds of bankruptcy fraud and knowing that such transactions were designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds:

 (a) the sale of the lake house and the farm on or about November 22, 1989;

 (b) the deposit of checks from the title company of funds from these real estate sales into the law firm trust account of LMC and Cully at Commerce Bank in Springfield, Missouri, on or about November 22, 1989;

 (c) the use of a check drawn on that trust account in the amount of $286,075.00 to fund a wire transfer from Commerce Bank in Springfield, Missouri to Marathon Coach in Eugene, Oregon;

 (d) the actual wiring of the $286,075.00 in funds from Commerce Bank in Springfield, Missouri to Marathon Coach in Eugene, Oregon; and

 (e) the purchase of the Defendant Property with said wired funds.

The foregoing transactions, particularly when considered together, concealed or disguised, within the meaning of 18 U.S.C. § 1956(a)(1)(B)(i), the proceeds of Sheehan's bankruptcy fraud by placing title to valuable property in the name of a third party nominee. Sheehan, despite the fact that record title was held in another's name, held virtually total dominion and control over the disposition of each of the real estate properties, their proceeds, and the Defendant Property (the ultimate proceeds), both before his bankruptcy petition was filed and thereafter.

these transactions occurred, Sheehan had no permanent residence and had not had one for several years. He had been staying in his former wife's (Betty's) home in Canada and renting in different cities, moving from place to place every six to eight months, while he flew as a pilot for Continental and later was treated for his health problems. *See* USA Ex. 323, at 15–30. He did not operate or insure a car for his own regular use at the time. *Id.* at 30–31.

■ The interstate commerce element of § 1956 is satisfied in this case, because there is no dispute that the Defendant Property was purchased with payment by wire from Missouri to Oregon.

■ LMC has failed to prove that Sheehan did not violate the federal money laundering statute, 18 U.S.C. § 1956, through his commission of an "unlawful activity," namely, bankruptcy fraud in violation of 18 U.S.C. § 152. Thus, the Defendant Property represents the proceeds of financial transactions conducted by Sheehan in violation of 18 U.S.C. § 1956.

■ **C. *The Defendant Property is Forfeitable under 18 U.S.C. § 981 as the Proceeds of Violations of the Money Laundering Laws.***—Section 981(a)(1)(A) renders forfeitable any property "involved" in a transaction or attempted transaction in violation of federal money-laundering laws embodied in 18 U.S.C. § 1956 "or any property traceable to such property." In a forfeiture proceeding arising under 18 U.S.C. § 981(a)(1)(A), the Fifth Circuit has held that a "substantial connection" must exist between the property to be forfeited and the crime alleged. *United States v. 1988 Oldsmobile Cutlass Supreme,* 983 F.2d 670, 673–74 (5th Cir.1993). The requirement of a "substantial connection" has traditionally received greater scrutiny by courts in those cases where the property to be forfeited facilitated the criminal violation as opposed to those cases where the property represents the proceeds of the criminal violation. This Court holds that proof of a substantial connection is required.

■ The Court holds that there is a substantial connection between the Defendant Property and Sheehan's violations of Sections 152 and 1956. The Defendant Property is the proceeds of these violations since it is the proceeds of the property Sheehan failed to disclose during his bankruptcy. From 1986–1989, the time frame relevant to this case, Sheehan was in control of LMC and its subsidiaries, Banner and B & B, the entities that nominally owned the real property assets in issue. These nominees held record title to the assets, and later LMC nominally held title to the proceeds, or the Defendant Property. Sheehan wanted to enjoy the benefits of these corporations' property, rather than losing it to the Chapter 7 Trustee to be used for the benefit of his creditors. Indeed, from 1989 through April 1993, when the Defendant Property was seized, Sheehan controlled and benefitted from the property. This Court has no doubt that the Defendant Property is substantially connected to the unlawful activity, as alleged by the United States.

Therefore, LMC has not met its burden to demonstrate that no such substantial connection exists in this case. LMC's First and Second Defenses, *see* Answer, at 12, are hereby dismissed.

**7. *Rulings on Other Arguments Asserted by LMC.***

**Third and Fourth Defenses.**—The Court concludes, as stated above, that the Defendant Property constitutes proceeds of financial transactions conducted by Sheehan in violation of 18 U.S.C. § 1956. The property giving rise to the purchase of the Defendant Property, the lake house and the farm, should have been scheduled and disclosed during Sheehan's bankruptcy proceeding. LMC's Third and Fourth Defenses, *see* Answer, at 12–13, therefore are dismissed.

■ **Fifth Defense.**—The Court rejects the argument asserted by LMC that a settlement agreement agreed to by Bankruptcy Trustee Steven Smith, Banner Advertising, and B & B somehow bars the United States from bringing this action. The release in the settlement is limited to the claims made in the United States District Court for the Western District of Missouri, under a case styled *Banner Advertising, Inc., and B & B*

*Development, Inc. v. Union National Bank of Colorado, Defendant, and W. Steve Smith, Esq., Intervenor–Defendant.* LMC Ex. 12(f) *et seq.* Nothing in the settlement agreement purports to bind the United States. Furthermore, nothing therein bars the United States, which was not a signatory to the agreement, from bringing this action. *See Gilbert v. Ben–Asher,* 900 F.2d 1407, 1410 (9th Cir.), *cert. denied,* 498 U.S. 865, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990).

■ The fact that Sheehan was granted a discharge from bankruptcy on or about April 9, 1993 does not preclude the United States from bringing this action. *United States v. West,* 22 F.3d 586, 590 n. 10 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994); *see United States v. Pepper,* 51 F.3d 469, 473 (5th Cir.1995). LMC's Fifth Defense, *see* Answer, at 13–14, is dismissed in its entirety.

■ **Sixth Defense.**—LMC asserts an "innocent owner" defense within the meaning of 18 U.S.C. § 981(a)(2) as its Sixth Defense, *see* Answer, at 14. To prevail on an "innocent owner" defense, LMC has the burden of proving by a preponderance of the evidence that it was unaware, that (1) that the lake house and farm were sold; (2) that the proceeds from the sale were deposited into Mr. Cully's law firm trust account; and (3) that a portion of the proceeds were used to purchase the Defendant Property. LMC cannot and did not make this showing. Indeed, the uncontroverted evidence of record establishes that LMC had knowledge of all these matters, and its counsel so acknowledged repeatedly during trial. Prior to trial, LMC conceded in its answers to interrogatories that it had actual knowledge that these transactions occurred. During trial, Cully, as attorney and agent for LMC, testified that he knew of and participated in all of the above matters at the time that they occurred. Ross and Michelle Sheehan also testified that they knew of and approved all of the above transactions at or about the time they occurred. The innocent owner defense therefore is inapplicable to this case. *See United*

*States v. Real Property 874 Gartel Drive,* 79 F.3d 918, 923–24 (9th Cir.1996); *1988 Chevrolet Silverado,* 16 F.3d at 664–65.

■ LMC argues that it did not know anything about the Sheehan bankruptcy proceedings, and that Ross and Michelle Sheehan did not even know about the fact that Sheehan had filed, until after the Defendant Property was acquired. The Court rejects LMC's interpretation of the "innocent owner" defense since § 981(a)(2) does not require that the owner of the property at issue have knowledge of the illegality of the conduct giving rise to the forfeiture.[45] *United States v. 105,800 Shares of Common Stock,* 830 F.Supp. 1101, 1131 (N.D.Ill.1993) (Reinhardt, J.) (lack of subjective awareness of the illegality of one's involvement in a unlawful conduct is not sufficient to establish the innocent owner defense). In *United States v. 316 Units of Mun. Securities,* 725 F.Supp. 172, 180 (S.D.N.Y.1989), the court held that "innocent owner" within the meaning of § 981(a)(2) refers to lack of knowledge of the illegal transaction, not lack of knowledge of the transaction's illegality. Moreover, the plain language of § 981(a)(2) refers only to acts committed without the knowledge of the owner or lienholder. *See id. Accord United States v. Real Property 874 Gartel Drive,* 79 F.3d 918, 924 (9th Cir.1996); *United States v. 5709 Hillingdon Road, Charlotte, N.C.,* 919 F.Supp. 863, 869–70 (W.D.N.C.1996). Therefore, LMC's Sixth Defense is dismissed.

■ **Seventh Defense.**—A pre-seizure hearing to determine the existence of probable cause was not required in this case, as the property at issue is not real property, but is instead a motorized vehicle. Furthermore, LMC has stipulated to the existence of probable cause. *United States v. James Daniel Good Real Property,* 510 U.S. 43, 51–53, 114 S.Ct. 492, 500, 126 L.Ed.2d 490 (1993). Therefore, LMC's Seventh Defense regarding unlawful seizure and due process violations, *see* Answer, at 14–15, also is dismissed.

**Eighth Defense.**—LMC does not assert an Eighth Defense, *see* Answer, at 14–15.

---

**45.** In any event, the evidence does not support the argument as to Ross and Cully, since Ross signed a letter prepared by Cully declining to produce documents about LMC when requested by the Bankruptcy Trustee.

**Ninth Defense.**—LMC argues as its Ninth Defense, see Answer, at 15, that the Government cannot prove beyond a reasonable doubt that Sheehan violated 18 U.S.C. § 152 as alleged because the United States Attorney did not file criminal charges against Sheehan, because Sheehan was granted a discharge of his debts by the Bankruptcy Court, and because neither the Bankruptcy trustee, the United States Trustee nor any creditor objected to the discharge.

Sheehan's criminal conviction is not a prerequisite for this civil forfeiture action. *United States v. 1988 Oldsmobile Cutlass Supreme*, 983 F.2d 670, 675 (5th Cir.1993); *United States v. One 1987 Mercedes 560 SEL*, 919 F.2d 327, 331 (5th Cir. 1990). In addition, as noted above, there is no legal foundation for the proposition that a bankruptcy court discharge, with or without objection by trustees or creditors, precludes this forfeiture proceeding. *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir.1995) (bankruptcy proceedings and criminal prosecutions are fundamentally different in purpose and procedure); *United States v. West*, 22 F.3d 586, 590 n. 10 (5th Cir.1994) (bankruptcy discharge does not preclude criminal prosecution for bankruptcy fraud). Finally, LMC supplies the Court with the wrong standard and erroneously places the burden on the Government to prove Sheehan's guilt by the standard of proof in a criminal case. LMC's contentions are frivolous.

LMC further argues that the action is time-barred since the "applicable Statutes of Limitation have run." LMC supplies no authority for this proposition and it is rejected. Under 18 U.S.C. § 3284, when a debtor conceals assets during the pendency of his bankruptcy, the five-year limitations period does not begin to run after the final discharge or the denial of such discharge. In this case, less than a year passed from the discharge of Sheehan to the commencement of this case, and therefore the statute of limitations has not run, even if not tolled by Section 3284. This argument is frivolous as well. The Court therefore dismisses LMC's Ninth Defense. Moreover, this action was timely filed under 19 U.S.C. § 1621, in that it was filed within five years of the date Sheehan filed for bankruptcy. *See United States v. Real Property 874 Gartel Drive*, 79 F.3d 918, 922 (9th Cir.1996); see also 18 U.S.C. § 981(d) (provisions of customs laws in Title 19 of the United States Code apply to forfeitures under § 981).

**Tenth Defense.**—LMC's Tenth Defense of "excessive fines," see Answer, at 16, is without legal merit. Because a wrongdoer has no legitimate expectation that the law will protect the proceeds of his wrongdoing, forfeiture of criminally derived proceeds can never be "excessive" within the meaning of the Excessive Fines Clause of the Eighth Amendment. *United States v. Tilley*, 18 F.3d 295, 300 (5th Cir.), cert. denied, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 490 (1994); *United States v. Wild*, 47 F.3d 669, 676 (4th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 128, 133 L.Ed.2d 77 (1995); *United States v. $21,282 in United States Currency*, 47 F.3d 972, 973 (8th Cir.1995). If for purposes of the Excessive Fines Clause, the United States was required to show a correlation between Sheehan's wrongdoing and the value of the Defendant Property, the Court finds that the appropriate benchmark would be the losses sustained by Sheehan's creditors, not the $5,000.00 fine contemplated by 18 U.S.C. § 152. The Court further finds that the value of the Defendant Property, which Claimant estimates to be $275,000.00, is not excessive in comparison to the $163,363.89 owed to Sheehan's secured creditors and the additional $284,477.69 owed to Sheehan's unsecured creditors. The evidence of record is that the creditors would receive the proceeds of the forfeiture. *See* Smith Testimony. The Court dismisses LMC's Tenth Defense.

**Eleventh Defense.**—LMC appears in its Eleventh Defense to assert that this forfeiture is a violation of the due process "takings" clause of the Fifth Amendment, see Answer, at 16. LMC has filed no legal authorities in support of this contention. This defense is rejected for the reasons stated above.

**Advice-of-Counsel Defense.**—LMC, apparently on behalf of Sheehan in defense of the alleged violations of the criminal statutes

in issue, argued during trial that Sheehan's failure to make the required disclosures in his bankruptcy papers was due to his reliance upon the advice of Nelson Hensley, his bankruptcy counsel.

 The Court is not persuaded. The weight of the evidence is that Sheehan did not make full and complete disclosure to Hensley of his assets, liabilities, employment affiliations, and access (through his signature authority) corporate bank accounts of LMC and others. To the extent advice was given to Sheehan to not disclose his interests in LMC, Banner or B & B it was given on partial information. The evidence does not support LMC's contention that Hensley knowingly advised Sheehan to omit these matters from his bankruptcy petition, statement of affairs, schedules and attachments. When the client makes only partial or incomplete disclosures of the extent of his involvement or association with transactions or assets, the client cannot thereafter rely on an advice-of-counsel defense. *United States v. Carr,* 740 F.2d 339, 347 (5th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985). *See also United States v. Dunn,* 961 F.2d 648, 651 (7th Cir.1992); *United States v. Durnin,* 632 F.2d 1297, 1301 (5th Cir. Unit A 1980).

Therefore, LMC has failed to prove any of its defenses.

**Counterclaims.**—LMC also asserts counterclaims for damages and attorneys' fees. These arguments have no legal merit and will not be discussed in any detail since the Court has addressed them in the course of its rulings above. Therefore, LMC shall take nothing on its claims for affirmative relief.

## CONCLUSION

It is therefore

**ORDERED** that the Defendant Property is forfeited to the United States. It shall be disposed of according to law. It is further

**ORDERED** that all costs shall be taxed against LMC. 28 U.S.C. §§ 1918, 1920, 1921.